Kalpana Srinivasan (237460)
ksrinivasan@susmangodfrey.com
SUSMAN GODFREY L.L.P.
1901 Avenue of the Stars, Suite 950
Los Angeles, California 90067-6029
Telephone: (310) 789-3100
Facsimile: (310) 789-3150

*Attorney for Defendants AliphCom, Inc. and BodyMedia, Inc.*
(Additional Counsel for Defendants listed below signature line)

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| FITBIT, INC.,<br><br>        Plaintiff,<br><br>vs.<br><br>ALIPHCOM, INC. d/b/a JAWBONE and BODYMEDIA, INC.,<br><br>        Defendants. | Case No. 5:15-cv-04073-EJD<br><br>**DEFENDANTS ALIPHCOM, INC. d/b/a JAWBONE AND BODY MEDIA, INC.'S NOTICE OF MOTION AND MOTION FOR JUDGMENT ON THE PLEADINGS UNDER RULE 12(C) ON GROUNDS OF INELIGIBILITY UNDER 35 U.S.C. § 101**<br><br>Date:       December 8, 2016<br>Time:      9 a.m.<br>Courtroom: 4<br>Judge:    Hon. Edward J. Davila |

**Table of Contents**

NOTICE OF MOTION ............................................................................................................... 1

I. INTRODUCTION ........................................................................................................ 1

II. BACKGROUND .......................................................................................................... 3

    A. The Shared Specification ................................................................................. 4

    B. The '923 Patent .............................................................................................. 5

    C. The '053 Patent .............................................................................................. 7

    D. The '307 Patent .............................................................................................. 9

III. LEGAL STANDARD ................................................................................................ 12

    A. Patent claims directed to an abstract idea and lacking any inventive
       concept are ineligible under 35 U.S.C. § 101. ....................................... 12

    B. Judgment on the pleadings should be granted when the asserted patents
       are directed to ineligible subject matter. ................................................ 14

IV. ARGUMENT ............................................................................................................. 14

    A. The '923 Patent ............................................................................................ 15

       1. The '923 patent is directed to building blocks of the internet and
          abstract ideas of identifying a device and notifying a user to
          complete an action. ................................................................... 16

       2. Nothing in the claim limitations or combination thereof
          provides an inventive concept sufficient to confer patent
          eligibility. ................................................................................ 20

    B. The '053 patent is ineligible for the same reasons as the '923 patent. ................. 22

    C. The '307 patent is directed to generic devices configurable to perform
       the ineligible pairing process disclosed in the '923 and '053 patents. .................. 23

CONCLUSION ..................................................................................................................... 25

# Table of Authorities

Federal Cases

*Alice Corp. Pty. v. CLS Bank Int'l*,
134 S. Ct. 2347 (2014) .................................................................................. 16, 17, 21

*Bascom Global Internet Services, Inc. v. AT&T Mobility LLC*,
2016 WL 3514158 (Fed. Cir. June 27, 2016) ................................................. passim

*Bilski v. Kappos*,
561 U.S. 593 (2010) .................................................................................................. 17

*buySAFE, Inc. v. Google, Inc.*,
765 F.3d 1350 (Fed. Cir. 2014) ......................................................................... 18, 20

*Chavez v. United States*,
683 F.3d 1102 (9th Cir. 2012) ................................................................................. 18

*Comcast IP Holdings I, LLC v. Sprint Commc'ns Co. L.P.*,
55 F. Supp. 3d 544 (D. Del. 2014) ...................................................................... 7, 24

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*,
776 F.3d 1343 (Fed. Cir. 2014) ................................................................................ 23

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed. Cir. 2014) ................................................................................ 20

*Eclipse IP LLC v. McKinley Equip. Corp.*,
2014 WL 4407592 (C.D. Cal. Sept. 4, 2014) ....................................................... 6, 23

*Electric Power Group, LLC v. Alstom S.A.*,
No. 2015-1778, --- F.3d ----, slip op. (Fed. Cir. Aug. 1, 2016) ........................... 6, 17

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016) ........................................................................... 19, 20

*Genetic Techs. Ltd. v. Merial L.L.C.*,
818 F.3d 1369, 2016 WL 1393573 (Fed.Cir. 2016) ................................................. 21

*GT Nexus, Inc. v. Inttra, Inc*,
2015 WL 6747142 (N.D. Cal. Nov. 5, 2015) ............................................................. 24

*I/P Engine, Inc. v. AOL Inc.*,
576 F. App'x 982 (Fed. Cir. 2014) ............................................................................ 20

*In re BRCA1- & BRCA2-Based Hereditary Cancer Test Patent Litig.*,
774 F.3d 755 (Fed. Cir. 2014) .................................................................................. 18

*Intellectual Ventures I LLC v. Capital One Bank (USA)*,
792 F.3d 1363 (Fed. Cir. 2015) ................................................................................ 23

*Joao Bock Transaction Sys., LLC v. Fid. Nat. Info. Servs., Inc.*,
122 F. Supp. 3d 1322 (M.D. Fla. 2015) ................................................................. 6, 23

*Novo Transforma Techs., LLC v. Sprint Spectrum L.P.*,
    2015 WL 5156526 (D. Del. Sept. 2, 2015) ........................................................................... 23

*OIP Techs., Inc. v. Amazon.com, Inc.*,
    788 F.3d 1359 (Fed. Cir. 2015) ............................................................................................ 18

*Servs., GmbH v. Guidewire Software, Inc.*,
    728 F.3d 1336 (Fed. Cir. 2013) ............................................................................................ 26

*Shortridge v. Found. Constr. Payroll Serv., LLC*,
    2015 WL 1739256 (N.D. Cal. Apr. 14, 2015) ...................................................................... 18

*Ultramercial, Inc. v. Hulu, LLC*,
    772 F.3d 709 (Fed. Cir. 2014) .................................................................................... 6, 20, 21

State Cases

28 U.S.C. § 1659 ................................................................................................................................ 8

35 U.S.C. § 101 ..................................................................................................................... passim

35 U.S.C. § 271 ................................................................................................................................ 7

Cases

Fed. R. Civ. P. 12 ........................................................................................................................... 18

## <u>NOTICE OF MOTION</u>

PLEASE TAKE NOTICE that on December 8, 2016, at 9:00 AM, or as soon thereafter as this matter may be heard before Judge Edward J. Davila, in Courtroom 4, 5th Floor, United States Courthouse, 280 South 1st St., San Jose, California, Defendants AliphCom, Inc. d/b/a Jawbone and Bodymedia, Inc. ("Jawbone" or "Defendants") will, and hereby do, move the Court to grant Jawbone's Motion for Judgment on the Pleadings that the Asserted Patents are Directed to Ineligible Subject Matter Under 35 U.S.C. § 101.

## I.    INTRODUCTION

Fitbit has filed a series of retaliatory lawsuits against Jawbone—four in total, including one in the International Trade Commission asserting infringement of nine patents, all based on deeply flawed infringement theories that rely on overly expansive interpretations of the claims and functionalities. But the patents Fitbit asserts suffer from a flaw that preempts any need to evaluate Fitbit's infringement theories on the merits: They are directed to abstract ideas, devoid of any limiting or inventive factor and, as such, are ineligible for patent protection under 35 U.S.C. § 101. Indeed an Administrative Law Judge at the ITC has already invalidated three of the patents Fitbit asserted against Jawbone on that basis.

It is clear on their face that the Fitbit patents in this case are no exception. Fitbit alleges infringement of U.S. Patent Nos. 9,048,923 (the "'923 patent"), 9,026,053 (the "'053 patent"), and 9,106,307 (the "'307 patent" and, collectively, the "Asserted Patents"), all of which are entitled "System and Method for Wireless Device Pairing." As their titles reveal, the patents (and each asserted claim therein) are directed to the abstract and entirely ubiquitous idea of pairing one "electronic device" to "another device or service" through routine steps—verifying the identity of the device; notifying the user that the devices need to pair; and requiring the user to take an action ("tapping" the device) to complete the pairing—using known wireless communication methods such as Bluetooth ('923, '053, '307 patent, Abstract). The patents purport to apply this abstract

"pairing" concept on portable monitoring devices that have already been determined by an ITC ALJ to be insufficiently specific or inventive to confer patent eligibility on otherwise abstract ideas. Nothing about the pairing process disclosed here is specific or unique to wearable fitness monitors or small devices generally.

The process of connecting computerized devices wirelessly to enable data exchange is a fundamental building block of today's internet-based society and should not be permitted to be monopolized through patents that add nothing to this pre-existing technology. *See Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 717 (Fed. Cir. 2014) ("[T]ransfer of content between computers is merely what computers do."). Granting protection to the Asserted Patents would ensure just that result. As the cases below make clear, incorporating steps of verifying a device, signaling a user, and asking the user to validate the pairing by "tapping" the device are routine steps that add nothing inventive and do not constitute an improvement upon existing computer functionality in pairing devices.

- Claims that "specify what information…is desirable to gather, analyze, and display" but "do not include any requirement for performing the claimed functions of gathering, analyzing, and displaying…by use of anything but entirely conventional, generic technology" are ineligible for patent protection. *Electric Power Group, LLC v. Alstom S.A.*, No. 2015-1778, --- F.3d ----, slip op. at 11 (Fed. Cir. Aug. 1, 2016).

- "A method for communications in connection with a computer-based notification system, comprising: initiating a notification communication to a personal communications device ["PCD"] associated with a party, the notification communication relating to a task to be performed; during the notification communication, receiving a response from the party's personal communications device, indicating whether or not the party associated with the personal communications device will perform the task" is ineligible for patent protection. *Eclipse IP LLC v. McKinley Equip. Corp.*, 2014 WL 4407592, at *6–7 (C.D. Cal. Sept. 4, 2014)

- Claims relating to "the account holder receiving notification to approve or deny a transaction or that a transaction has been approved or denied" are directed to an abstract idea. *See Joao Bock Transaction Sys., LLC v. Fid. Nat. Info. Servs., Inc.*, 122 F. Supp. 3d 1322, 1331 (M.D. Fla. 2015).

- Patents directed to "[r]eceiv[ing] a request" and "[d]etermin[ing] whether that request

requires a user prompt" are directed to the abstract idea of "conditional decision-making." *Comcast IP Holdings I, LLC v. Sprint Commc'ns Co. L.P.*, 55 F. Supp. 3d 544, 548 (D. Del. 2014).

The Asserted Patents should be found ineligible under 35 U.S.C. § 101, and there is no issue of claim construction preventing the Court from making that determination on the pleadings alone.

## II.    BACKGROUND

Fitbit and Jawbone design, market, and sell wearable devices that track sleep, activity, and other health and fitness data ("wearable activity devices"). This case is the second of three cases Fitbit filed against Jawbone in district courts on opposite coasts, alleging patent infringement under 35 U.S.C. § 271. On September 3, 2015, Fitbit filed a suit in the District of Delaware alleging infringement of three patents based on the same Accused Products—Jawbone's UP line of fitness trackers. That case has been transferred to this District (N.D. Cal. 16-cv-118). This case was filed on September 8, 2015. In response, Jawbone filed an antitrust counterclaim alleging that "Fitbit filed this meritless patent case as part of its by-any-means-necessary campaign to impede competitors and preserve its dominant position in the fitness-tracker market," and that "[n]one of Jawbone's accused products even arguably infringes the asserted patents, making it clear that Fitbit intends to use this case to intimidate and harass its most prominent competitor rather than legitimately enforce its intellectual property rights." Amended Answer and Counterclaims at 6 (Dkt. 43), Exhibit A.[1]

On October 29, 2015, Fitbit filed a third case in the District of Delaware (D. Del. 15-cv-990), alleging infringement of three additional patents based again on the same Accused Products. Fitbit, and designated as related to what is now N.D. Cal. 16-cv-118. That case was mandatorily

---

[1] On May 27, 2016, this Court bifurcated and stayed Jawbone's counterclaim pending resolutions of Fitbit's infringement claims. *See* Order Granting Plaintiff's Motion to Bifurcate and Stay (Dkt. 76).

stayed pursuant to 28 U.S.C. § 1659 based on Fitbit's institution of a parallel investigation in the International Trade Commission ("ITC") on November 2, 2015 (Investigation No. 337-TA-973) (the "ITC 973 Action"). On July 20, 2016, an ITC ALJ ruled the three patents asserted in the ITC 973 Action (the same patents asserted in D. Del. 15-cv-990) ineligible under 35 U.S.C. § 101.[2] Relevant here, the ALJ found that the disclosure in a wearable fitness device of "the housing, the plurality of sensors, the three accelerometers, the processing circuitry, and the display" were known and conventional. ITC 973 Action, Order No. 24 at 36, Exhibit B.[3]

The three patents asserted here—the '923, '053, and '307 patents—are directed to pairing a generic portable device with a second unspecified device, using Bluetooth protocol or some other known method of wireless communication (no particular method is specified). *See* '923 patent at 3:64- 68; '053 patent at 3:58-61;'307 patent at 3:60-64. Fitbit does not claim to have invented a single component of the devices that enable pairing or the wireless technology that enables such pairing, nor does it claim to have applied these elements in an innovative or unconventional manner. Rather, the Asserted Patents simply recite conventional steps for connecting two devices, in an entirely routine order, without meaningful limitations, specificity, or innovation of any kind.

## A. The Shared Specification

All three Asserted Patents share the same specification, which lays out the problem to which the Asserted Patents are directed as follows:

> Individuals typically own and use multiple portable devices, each of which has one or more particular functions, including cell phones, personal digital assistants, navigation devices, and body monitoring or fitness-oriented devices.…

---

(… cont'd)

[2] Jawbone filed a motion to transfer the D. Del. 15-cv-990 to this District on December 17, 2015. However, the case was stayed pursuant to 28 U.S.C. § 1659 before the motion was decided.

[3] The ITC has not yet filed a public version of Order No. 24. When a public version is filed, Jawbone will file a supplemental exhibit with the Court.

It is expected that these various devices can communicate with the Internet and/or with each other for uploading and downloading data or otherwise transferring data.…

When monitored data is collected by the device, it is desirable to transfer the data …to other devices so the user can easily review the data.…

In order for a portable device to communicate with another device…the device is usually initially paired to an online account and/or to another device. Typically, this involves authentication, and also identification or verification of the device to be paired.…Authentication includes verifying that the user is authorized to access the account…to which data will be transmitted. Identification of the device can include discovery of the device by client software (such as software on a personal computer…in communication with a cloud-based server) that is programmed to look for specific identifying information.

It is desirable to minimize the amount of user interaction and input required in the pairing process for ease of use. This is particularly true of small devices.…

'923 patent at 1; '053 patent at 1; '307 patent at 1. The specification defines "pairing" as "includ[ing] linking devices in order to send information between devices" and "pairing between a device and a service. *Ids.* at 2. The specification further clarifies that "the invention is not limited to a portable biometric device" and could include "portable or non-portable devices" from "weight scales" to "mobile phones." *Ids.* At 2-3.

**B.      The '923 Patent**

Fitbit asserts that the Accused Products (Jawbone's UP2, UP3 , and UP4) infringe Claims 1, 2, 7-10, and 13 of the '923 patent. *See* Infringement Contentions. Independent claim 1 of the '923 patent is the only independent claim asserted and discloses "a portable monitoring system, comprising:"

a first device configurable to communicate wirelessly with a second device, wherein at least one of the first device and the second device comprises a portable monitoring device comprising,

wireless transmitter circuitry;

wireless receiver circuitry;

a plurality of sensors configurable to sense a plurality of physical phenomena;

user interface means for communicating to a user, wherein the user interface means comprises one or more of a screen, a touch screen, a vibramotor, a keyboard, light emitting diodes (LEDs), and buttons; and

processing circuitry configurable to interpret data from the plurality of sensors; and

wherein to communicate wirelessly includes a pairing process comprising,

the first device automatically discovering the second device by wireless communication;

the first device receiving user login information to log the user into a user account;

the first device sending a signal to a server that indicates the start of the pairing process;

the server sending user interface data for pairing to the first device;

the first device wirelessly detecting the second device, and requesting a response from the second device;

the first device receiving a response from the second device, including a device identification;

in response to the first device forwarding the received response to the server, the server sending a list of detected devices eligible for pairing to the first device;

when the second device is on the list of detected devices, the first device sending a command to the second device to enter pairing mode;

the second device cueing the user via the user interface to validate a request to pair;

the second device receiving input from the user to respond to the request, wherein the input is received by one or more of the plurality of sensors, wherein input comprises tapping only the second device anywhere on its exterior;

the second device detecting the tapping using a motion sensor;

and the first device and the second device completing the pairing process while remaining remote from each other.

'923 patent at 15:2-49. In short, this claim describes the wholly conventional process of pairing

two electronic devices using known Bluetooth or similar technology, conventional servers, and

notification and verification processes that require the user to "tap" the device. The only aspect of the process that Fitbit does not expressly admit (in the specification) is known in the art is the manner in which the user initiates the pairing process – by "tapping" or "touching the device on any part of its exterior."[4]

Dependent claims 2 and 8 add variations on the types of sensors that comprise the "plurality of sensors" disclosed in claim 1, and claim 2 specifies that the "tapping" element must be detected by a motion sensor; claim 9 adds to claim 8 the requirement that the "plurality of sensors" detect one of "steps taken, elevation gained, or distance traversed;" claim 10 adds to claim 1 that the "cueing" take the form of "vibrating, illuminating, making a sound, [or] displaying a message;" and claim 13 specifies that the tapping must be detected by an accelerometer. *See id.* at 15:50-16:49.

### C. The '053 Patent

Fitbit asserts that that the Accused Products infringe Claims 1, 2 and 5-9 of the '053 patent. *See* Infringement Contentions. Independent Claim 1 of the '053 patent is the only independent claim asserted. Claim 1 discloses "a wireless communication method," comprising:

> a first portable biometric device and a second device communicating wirelessly to initiate a pairing process between the first portable biometric device and the second device, wherein the first portable biometric device comprises,
>
> at least one sensor;
>
> and wireless communication circuitry in a unit suitable to be worn by a moving human device user, wherein initiating the pairing process comprises,
>
> the second device receiving user login information to log the user into a user account;
>
> the second device sending a signal to a server that indicates the start of the pairing

---

[4] The parties disagree as to construction of the term "tapping." However, it is unnecessary to resolve this or any other issue of construction to resolve to question of eligibility under 35 U.S.C. § 101, and for purposes of this motion, Jawbone is willing to accept Fitbit's construction of the term.

process;

the server sending a user interface for pairing to the second device;

the second device wirelessly detecting the first biometric device, and requesting a response from the first biometric device;

the second device receiving a response from the first biometric device, including a device identification;

in response to the second device forwarding the received response to the server, the server sending a list of detected devices eligible for pairing to the second device;

and when the first biometric device is on the list of detected devices, the second device sending a command to the first biometric device to enter pairing mode;

the first portable biometric device generating a cue to the first portable biometric device user requesting the first portable biometric device user to validate the pairing between the first portable biometric device and the second device;

the first portable biometric device receiving input from the user indicating the user's agreement to validate the pairing request, wherein input comprises tapping only the first portable biometric device one or more times anywhere on its exterior;

the first portable biometric device detecting the tapping using a motion sensor;

the first portable biometric device responding to the user input by remotely signaling the second device to complete the pairing process;

the second device and the first portable biometric device remotely communicating to complete the pairing process, wherein the first portable biometric device and a second device are remote from each other throughout the pairing process, after which the first portable biometric device and the second device are able to recognize each other;

and the first portable biometric device and the second device automatically communicating to wirelessly exchange data subsequent to pairing when the first portable biometric device and the second device are within wireless communication range;

wherein data comprises sensor data collected and stored by the first portable biometric device.

'053 patent at 14:63-16:5. Again, this claim describes only the conventional process of pairing two electronic devices.

Dependent claim 2 adds that "pairing further comprises pairing the first portable biometric

device to a user account"—for example an account on a webpage; claims 5 and 7 add variations on the way in which the user receives the "cue;" claim 6 adds variations to the user interface; claim 8 adds variations on the type of motion sensor in the portable biometric device; and claim 9 adds the variation of there being more than one portable biometric device within the range of the second device. *See id.* at 16:6-44.

### D. The '307 Patent

Fitbit asserts that Jawbone infringes Claims 1-3, 5-10, 14, and 16-19 of the '307 patent. *See* Infringement Contentions. Independent Claim 1 of the '053 patent discloses "a portable monitoring device comprising:"

> a user interface comprising at least one of, a speaker; a vibramotor; motion sensors; gesture recognition sensors; a touch screen; a microphone; and buttons;
>
> transmitter circuitry and receiver circuitry;
>
> a plurality of sensors configurable to sense physical phenomena;
>
> processing circuitry coupled to the plurality of sensors to receive sensor data and calculate metrics associated with a user, the processing circuitry configurable to communicate with another device and with a user, wherein communicating comprises a pairing process between the portable monitoring device and the other device, including,
>
> the other device receiving user login information to log the user into a user account;
>
> the other device sending a signal to a server that indicates the start of the pairing process;
>
> the server sending user data for pairing to the other device;
>
> the other device wirelessly detecting the portable monitoring device, and requesting a response from the portable monitoring device;
>
> the other device receiving a response from the portable monitoring device, including a device identification;
>
> in response to the other device forwarding the received response to the server, the server sending a list of detected devices eligible for pairing to the other device;
>
> when the portable monitoring device is on the list of detected devices, the other device sending a command to the portable monitoring device to enter pairing

mode;

the portable monitoring device cueing the user via the user interface to validate the request to pair;

the portable monitoring device receiving input from the user to validate the pairing request, wherein input comprises tapping the device on any part of its exterior; and

detecting the tapping with one of the motion sensors.

'307 patent at 15:2-47. Yet again, this claim describes a conventional pairing process, with the confirmation of a pairing request being provided by the idea of a tap.

Dependent claim 2 adds variations on the metrics measured by the device disclosed in claim 1. Dependent claim 3 adds that "communicating further comprises responding to user input by completing the pairing process." *See id.* at 15:48-58.

Independent claim 5 discloses "[a] sensor system comprising":

at least one client device configurable to communicate wirelessly;

at least one sensor device configurable to communicate wirelessly with the at least one client device, the at least one sensor device comprising,

a plurality of sensors configurable to collect user data,

transmitter circuitry and receiver circuitry for communicating wirelessly,

wherein communicating comprises pairing the at least one client device with the at least one sensor device, including,

the at least one client device receiving user login information to log the user into a user account;

the at least one client device sending a signal to a server that indicates the start of the pairing process;

the server sending a user interface for pairing to the at least one client device;

the at least one client device wirelessly detecting the first biometric device, and requesting a response from the first biometric device;

the at least one client device receiving a response from the first biometric device, including a device identification;

in response to the at least one client device forwarding the received response to the server, the server sending a list of detected devices eligible for pairing to the second device;

when the at least one sensor device is on the list of detected devices, the at least one client device sending a command to the at least one sensor device to enter pairing mode;

the at least one sensor device cueing the user to validate the request to pair; and

the at least one sensor device receiving input from the user to validate the pairing request, wherein input comprises tapping the at least one sensor device on any part of its exterior.

*Id.* at 15:65-16:37.

Dependent claim 6 add variations on the elements of the sensor device; claim 7 adds variation on the method of "cueing" the user; claim 8 specifies that tapping must be detected by a motion sensor; claim 9 adds variations on the nature of the sensor device; claim 10 adds variations on the nature of the second device; claim 14 specifies that communicating wirelessly involves "at least one client device causing the at least one sensor device to indicate to the user that the at least one client device wants to initiate pairing the at least one client device with the at least on sensor device." *See id.* at 16:38-17:18.

Independent claim 16 discloses "[a] portable monitoring device," comprising:

a processor configured to execute a data collection process and a communication process;

wireless transmitter circuitry and wireless receiver circuitry for communicating with a client device;

a plurality of sensors for sensing user data comprising, sleep activity; step count; calorie burn; distance traversed; speed; and heart rate;

a user interface for communicating with the user, wherein communicating comprises indicating to the user that the personal monitoring device has been requested by the client device to pair with the client device as part of a pairing process comprising,

the client device receiving user login information to log the user into a user account;

the client device sending a signal to a server that indicates the start of the pairing process;

the server sending a user interface for pairing to the client device;

the client device wirelessly detecting the personal monitoring device, and requesting a response from the first biometric device;

the client device receiving a response from the personal monitoring device, including a device identification;

in response to the client device forwarding the received response to the Server, the server sending a list of detected devices eligible for pairing to the client device; and

when the personal monitoring device is on the list of detected devices, the client device sending a command to the personal monitoring device to enter pairing mode.

*Id.* at 17:30-18:16.

Dependent claim 17 states that the data collection process comprises collecting user data from the plurality of sensors and the data is transferred to the client device and associated with a user account; claim 18 adds a user authentication prior to data transfer; claim 19 adds that the personal monitoring device is detected by proximity. *See id.* at 18:17-18:31.

## III.     LEGAL STANDARD

### A.     Patent claims directed to an abstract idea and lacking any inventive concept are ineligible under 35 U.S.C. § 101.

Section 101 of the patent act defines the subject matter eligible for patenting and provides that a patent may be obtained for "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. Implicitly excluded from patent protection are "[l]aws of nature, natural phenomena, and abstract ideas." *Alice Corp. Pty. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014). In *Alice*, the Supreme Court set forth a two-step analysis to determine whether subject matter claimed in a patent constitutes an unpatentable abstract idea. *Id.* at 2355. The touchstone of the *Alice* inquiry is to avoid granting protection to patents that would "pre-empt use of [a given] approach in all fields,

Defendants' Motion for Judgment on the Pleadings     12     Case No. 5:15-cv-04073-EJD

and…effectively grant a monopoly over an abstract idea." *Id*. at 2354 (quoting *Bilski v. Kappos*, 561 U.S. 593, 611-612 (2010)).

At the first step, the court must determine whether the claims of the patent "are directed to one of th[e] patent-ineligible concepts" such as an abstract idea. *Id.* If the claims are not directed at such a concept, the patent passes muster under § 101. If the claims are determined to address patent-ineligible subject matter, the Court must proceed to step 2 and consider whether the claims contain "an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Id.* (quotation marks omitted, alteration in original).

To determine whether a claim is directed to an abstract idea, the court "look[s] at the 'focus' of the claims, their 'character as a whole.…" *Electric Power Group, LLC v. Alstom S.A.*, No. 2015-1778, --- F.3d ----, slip op. at 6 (Fed. Cir. Aug. 1, 2016); *accord Bascom Global Internet Services, Inc. v. AT&T Mobility LLC*, 2016 WL 3514158 *5 (Fed. Cir. June 27, 2016) (looking, at step 1, at the "inventions' basic thrust"). "[T]he first step in the *Alice* inquiry…[also] asks whether the focus of the claims is on [a] specific asserted improvement in computer capabilities…or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool." *Id.* at *5.

If the patent is determined to be directed to an abstract idea under step 1, at the second step the court "must examine the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Alice*, 134 S. Ct. at 2357. Disclosure of pre-existing, generic computer components such as processors and memory to implement an abstract idea does not render that idea patent-eligible. *Id.* at 2358 ("[T]he mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention."). In order for a patent that claims only known elements to be eligible for protection, that patent must disclose "non-conventional and

non-generic arrangement of known, conventional pieces." *Bascom*, 2016 WL at *6.

**B.    Judgment on the pleadings should be granted when the asserted patents are directed to ineligible subject matter.**

Fed. R. Civ. P. 12(c) authorizes judgment on the pleadings when, "accepting all factual allegations in the complaint as true…there is no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law." *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012). Patent-eligibility "is an issue of law" that is appropriately adjudicated on the pleadings. *In re BRCA1- & BRCA2-Based Hereditary Cancer Test Patent Litig.*, 774 F.3d 755, 759 (Fed. Cir. 2014); *see also OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1360 (Fed. Cir. 2015) (granting judgment of patent ineligibility on the pleadings); *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1352 (Fed. Cir. 2014) (same); *Shortridge v. Found. Constr. Payroll Serv., LLC*, 2015 WL 1739256, at *1 (N.D. Cal. Apr. 14, 2015) (same). The Federal Circuit has recognized that "[a]ddressing 35 U.S.C. § 101 at the outset [of litigation] not only conserves scarce judicial resources and spares litigants the staggering costs associated with discovery and protracted claim construction litigation, it also works to stem the tide of vexatious suits brought by owners of vague and overbroad" patents. *OIP Techs.*, 788 F.3d at 1364.

## IV.    ARGUMENT

Each of the Asserted Patents is directed to the ubiquitous process of connecting generic electronic devices together using conventional steps of discovery, authentication, and confirmation. They involve collecting data about one portable device and transmitting that information to another device using known wireless technology (*i.e.*, Bluetooth protocol) through routine, well-known steps—including verifying the correct device, and "cueing" users to tap on their devices to complete the pairing process. Importantly, the devices on which this pairing process is performed—in those embodiments that contain any limitations at all—have already been ruled insufficiently specific or inventive to confer eligibility on patents that were otherwise

directed to abstract ideas in the ITC 973 Action. *See generally* 973 ITC Action, Order No. 24. The particulars of Fitbit's "pairing" method—which include the abstract concepts of detecting which device to pair using (as Fitbit acknowledges) known Bluetooth or similar technology, and requesting that the user respond to validate the pairing by "tapping" on the device—add nothing inventive or limiting to the manner in which these devices, as opposed to the countless other devices that use Bluetooth, wirelessly exchange data or connect with other devices. To the contrary, the specification recognizes that it is "typical" for a pairing process to involve authentication, identification, and verification of the device. See '923, '053, '307 patents at 1. Requiring a user notification and response as part of that process is not a concrete limitation.

On their face these patents claim a building block of our internet-based society using routine steps for authentication, identification and verification, and are ineligible for patent protection under 35 U.S.C. § 101. No issue of construction or question of fact precludes judgment on the pleadings.

**A.      The '923 Patent**

On its face the '923 patent claims the basic steps of initiating a connection between two generic computerized devices using well-known wireless technology. Viewed more narrowly, the patent is directed to a method for wirelessly "identifying and validating an electronic device" through "minimal user interaction." '923 patent at 2:20-21. No matter the level of granularity at which the claims of the '923 patent are viewed, they are directed to "abstract concepts" as defined in *Alice* and its progeny. *See Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016) (in determining what constitutes and "abstract idea" courts "compare claims at issue to those claims already found to be directed to an abstract idea in previous cases"). The claims disclose no inventive concept or novel application of these well-known practices. Accordingly, the '923 patent is ineligible under 35 U.S.C. § 101.

**1.     The '923 patent is directed to building blocks of the internet and abstract ideas of identifying a device and notifying a user to complete an action.**

In considering, at step 1 of *Alice*, whether a patent is "directed to" an abstract idea, the court must "look at "the focus of the claims" and "their character as a whole." *Electric Power*, Slip. Op. at 6; *see also Bascom*, 2016 WL 3514158, at *5 (looking, at step 1, at the "inventions' basic thrust"). The claims are to be "considered in light of the specification." *Enfish*, 822 F.3d at 1335.

The focus of the claims of the '923 patent is a fundamental building block of today's internet-based society—wirelessly connecting two computerized devices to enable the exchange of data.  It is quintessentially abstract under 35 U.S.C. § 101. *See, e.g.*, *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1256 (Fed. Cir. 2014) ("fundamental economic and conventional business practices are also abstract ideas"); *Ultramercial*, 772 F.3d at 714 (ideas that are "routine," "long prevalent," or "conventional" are in the "*Alice* zone"); *buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) ("That a computer receives and sends the information over a network—with no further specification—is not even arguably inventive."); *I/P Engine, Inc. v. AOL Inc.*, 576 F. App'x 982, 995 (Fed. Cir. 2014), *cert. denied*, 136 S. Ct. 54, (2015) (Mayer, J., concurring) (noting that "use of search engines was well-established and the clear advantages of combining content-based and collaborative filtering were widely recognized at the time of the claimed invention.").

The specification shared by the Asserted Patents acknowledges that "individuals typically own and use multiple portable devices…including cell phones, personal digital assistants, navigation devices, and body monitoring or fitness-oriented devices." '923 at 1:26-30. "It is expected that these various devices can communicate with the Internet and/or with each other for uploading and downloading data or otherwise transferring data." *Id.* at 1:31-34. The specification acknowledges further that "*[t]ypically*, this involves authentication, and also identification or

verification of the device to be paired." *Id.* at 1:38-40 (emphasis added). Nothing about the way that these steps are completed is anything but routine.

Claim 1 of the '923 patent recites routine interactions between computerized devices connecting to each other over the ubiquitous medium of wireless communications: one device automatically detecting another; receiving user login information; sending a signal to a server that indicates the start of the pairing process; the server sending data for pairing to the first device; the first device wirelessly detecting the second device and requesting a response; the first device identifying the second device; the second device notifying the user to validate the request to pair; the user responding that request; and the devices completing the pairing process while remaining remote from each other. '923 patent at 15:1-49. Yet patents applying abstract ideas using routine steps on a ubiquitous information-transmitting medium are not eligible for patent protection. *Ultramercial*, 772 F.3d at 716. That is true here.

The technology for wireless communication disclosed in the '923 patent is standard Bluetooth protocol or its equivalents—which the patent acknowledges is "known in the art." '923 patent at 3:60-61. Nothing about the method disclosed for connecting the two computerized devices introduces any meaningful limitation on, or improvement to preexisting methods, whether generally, or in the realm of wearable fitness trackers. Rather, the specification is intentionally broad. It states that a "portable biometric monitoring device is used as an example of a portable device that can be paired according to the invention disclosed herein" but "the invention is not limited to a portable biometric device" and could range from weight scales to mobile phones. *Id.* at 2:64-3:12. This broad disclosure of standard pairing steps implicates the precise preemption concern of "disproportionately tying up" underlying ideas that "undergirds" the *Alice* test. *Alice*, 134 S.Ct. at 2354.

The Federal Circuit has held that it may be appropriate to limit the "directed to" inquiry at step 1 to a patent's "claimed advance over prior art." *Genetic Techs. Ltd. v. Merial L.L.C.*, 818

F.3d 1369, 1375, 2016 WL 1393573, at *5 (Fed.Cir. 2016). The '923 patent characterizes this advance as related to "minimiz[ing] the amount of user interaction and input required in the pairing process for ease of use." '923 patent at 1:53–54. Claim one contains the following limitations related to user interaction and input required in the pairing process:

> in response to the first device forwarding the received response to the server, the server sending a list of detected devices eligible for pairing to the first device;
>
> when the second device is on the list of detected devices, the first device sending a command to the second device to enter pairing mode;
>
> the second device cueing the user via the user interface to validate a request to pair; the second device receiving input from the user to respond to the request, wherein the input is received by one or more of the plurality of sensors, wherein input comprises tapping only the second device anywhere on its exterior; the second device detecting the tapping using a motion sensor;
>
> and the first device and the second device completing the pairing process while remaining remote from each other.

These steps of: (1) determining which of a number of portable devices is the target of the pairing process; (2) notifying a user to validate the pairing; and (3) requiring a response from the user are abstract concepts inherent in any pairing process. See '923 patent at 1:38-40 ("Typically, [pairing] involves authentication, and also identification or verification of the device to be paired."). Nothing about the way the devices are authenticated, identified or verified is limiting or inventive. Nor is the fact that the response comes in the form of "tapping" the device is not an innovation in technology, nor does it add any inventive concept to these otherwise routine steps.[5]

The step of the server sending a list of detected devices eligible for pairing and the first device sending a command to enter pairing mode when the second device is on the list is the

---

[5] Indeed, the prosecution histories of the patents reveal that "tapping" as a way of verifying a wireless device was well-known in the art, and not considered inventive. Specifically, the patent examiner declined to allow the '923 patent based on Fitbit's distinction of the user tapping the device versus the user tapping the two devices together. Fitbit ultimately resorted to adding a series of conventional client-server account authorization steps—which, as discussed above, are themselves routine aspects of pairing wireless devices, using known technology—to get the claims allowed.

equivalent of "collecting data [and] recognizing certain data within the collected data set," which the Federal Circuit has held is an abstract idea. *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014) ("The concept of data collection [and] recognition…is undisputedly well-known."). *See also Bascom*, 2016 WL 3514158, at *5 (rejecting that argument that if a concept arises only in the realm of computers it automatically survives *Alice* and holding instead that "filtering content is an abstract idea because it is a longstanding, well-known method of organizing human behavior.…"); *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1369 (Fed. Cir. 2015) ("information tailoring is a fundamental…practice long prevalent in our system.…") (quotations omitted).

Likewise, courts have held that patents that claim user notifications are directed to an abstract idea. *See Joao Bock Transaction Sys.*, 122 F. Supp. at 1331 (claims relating to "the account holder receiving notification to approve or deny a transaction or that a transaction has been approved or denied" are directed to an abstract idea).[6] The claims at issue in *Eclipse IP LLC v. McKinley Equip. Corp.*, are instructive. The patent at issue claimed, in relevant part:

> [a] method for communications in connection with a computer-based notification system, comprising: initiating a notification communication to a personal communications device ["PCD"] associated with a party, the notification communication relating to a task to be performed; during the notification communication, receiving a response from the party's personal communications device, indicating whether or not the party associated with the personal communications device will perform the task.…

2014 WL 4407592 at *6. The court found that such steps "can be performed by a person talking on the phone" and the fact that the method was performed "in connection with a computer-based notification system," did not cure the abstractness where the patent required no "specially-

_____

(… cont'd)

[6] *Accord Novo Transforma Techs., LLC v. Sprint Spectrum L.P.*, 2015 WL 5156526, at *3 (D. Del. Sept. 2, 2015) (finding a "process for delivering messages from a sender to recipient over a communication network" which includes "an automatic notification…provided to the sender upon receipt of the message by the recipient" to be an ineligible process).

equipped PCD to implement the invention and to achieve its benefits." *Id.*; *accord GT Nexus, Inc. v. Inttra, Inc*, 2015 WL 6747142, at *7 (N.D. Cal. Nov. 5, 2015) (holding that dependent claim which added the limitation of a "server" further "configured to generate electronic event notification messages" did not constitute a sufficient limitation to confer patent eligibility); *see also Comcast IP Holdings I, LLC v. Sprint Commc'ns Co. L.P.*, 55 F. Supp. 3d 544, 548 (D. Del. 2014) (holding that a patent directed to "[r]eceiv[ing] a request" and "[d]etermin[ing] whether that request requires a user prompt" was directed to the abstract idea of "conditional decision-making.").[7]

> **2.     Nothing in the claim limitations or combination thereof provides an inventive concept sufficient to confer patent eligibility.**

As described above, the '923 patent is directed to the fundamental practice of connecting two devices through wireless technology and, in particular, to the abstract ideas of verifying the correct device and notifying the user to validate the pairing. Thus, it is necessary to proceed to step 2, where the court "consider[s] the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application. *Bascom*, 2016 WL 3514158, at *4.

As expressly stated in the patent specification, the claim elements themselves are generic and well-known in the art. *See* '9:23 patent at 3:60-61 (noting that the information transmitted between devices uses Bluetooth or other wireless technology that was "known in the art"); *id.* at 1:31-34 ("It is expected that these various devices can communicate with the Internet and/or with

---

(… cont'd)

[7] The court in *Comcast* rejected the argument that the claims covered only "methods performed by a device in a telephony network, not a human," and were "narrowly directed to overcoming a specific problem of telephony networks by using telephony parameters to optimize bandwidth allocation on such networks."   55 F. Supp. 3d at 548 ("[T]he question for the Court at this juncture is not to determine whether there are sufficient limitations, but instead to determine whether and what is "the abstract idea at the heart" of the claim.").

each other for uploading and downloading data or otherwise transferring data."); *id.* at 2:64-3:12 ("[T]he invention is not limited to a portable biometric device" and could range from weight scales to mobile phones).

Even if the '923 patent was limited to wearable activity trackers—which it expressly is not—it is well-established that "the prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of the formula to a particular technological environment.…" *Bilski,* 130 S. Ct. at 3230 (internal quotation marks omitted). To the extent that the '923 patent places any limitations at all the on the device, it discloses generic computer components—wireless transmitter and receiver circuitry; a plurality of sensors; a user interface (which could be a screen, touch screen, keyboard, LEDs, buttons or a vibramotor); and processing circuitry configurable to interpret data from the plurality of sensors. *Id.* at 15:5-16. These generic components place no meaningful limitation on the method itself. *See* ITC 973 Action, Order No. 24 at 36 (rejecting the argument that performing a claimed method on a "known and conventional [device], including, the housing, the plurality of sensors, the three accelerometers, the processing circuitry, and the display" was a sufficient limitation to confer patent eligibility). Nothing about the disclosure of this device distinguishes the system from the basic methods by which a wireless device—cell phones, watches, speakers—is paired with a second computer device.

The Federal Circuit recently clarified that "[t]he inventive concept inquiry requires more than recognizing that each claim element, by itself, was known in the art" and "can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *Bascom*, 2016 WL 3514158, at *6. Unlike in *Bascom*, however, no such "non-conventional" or non-generic" arrangement of known pieces can be found in the claims of the '923 patent. Nothing about the method disclosed constitutes an improvement on the way one device connects with another, or resolves a particular problem in the realm of portable devices, small devices, or wearable activity trackers specifically. Nor does the limitation that the notification response

comes in the form of "tapping" the device, add anything inventive to the claims. Touching portable devices (for example placing one's thumb on the iPhone to unlock it, or tapping a Bluetooth speaker to initiate the pairing with a mobile phone) in order to confirm a request or perform an action is commonplace, and well known in the art.

The dependent claims add variations on the type of sensors in the device and what those sensors are capable of detecting, but none of these claims disclose novel or innovative uses of the sensors they disclose, in the context of pairing or otherwise. Rather, motion sensors detect motion, and, specifically, accelerometers detect movement, and the sensors, together, detect "steps taken, elevation gained, or distance traversed." These variations have already been held to be directed to abstract ideas. *See generally* ITC 973 Action, Order No. 24. They add nothing inventive to the overall method disclosed here. The '923 patent is not redeemed at step 2 of the *Alice* test, and is therefore ineligible for patent protection.

**B.     The '053 patent is ineligible for the same reasons as the '923 patent.**

Whereas the '923 patent discloses a "wireless device pairing" system, the '053 patent discloses "a wireless communication method." '053 patent at 14:63. The patents share a single specification. As already stated above, the '923 patent's system claim is ineligible under 35 U.S.C. § 101. If there is *any* basis for distinguishing the two patents, it is that the method claim disclosed in the '053 patent is *more* abstract, and contains fewer limitations than the system disclosed in the '923 patent. *See Accenture Glob. Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1342 (Fed. Cir. 2013) (where the system claim "includes virtually the same limitations and many of the same software components" as the patent-ineligible method claims, finding it appropriate to identify any "additional limitations in the system claim" to determine whether it is patent eligible).

Like the '923 patent, the '053 patent is directed to two devices "communicating wirelessly to initiate a pairing process." The steps comprising the pairing process are identical. The only

difference is that the claim limitations on the device are even fewer: it must contain "at least one sensor; and wireless communication circuitry in a unit suitable to be worn by a moving human device user." '053 patent at 15:1-3. Nothing in the dependent claims adds specificity to the subject matter claimed by the '053 patent, nor do they add any "inventive step." Rather, like the dependent claims in the '923 patent, they simply add variations on the generic components disclosed in the device, the way the user receives the "cue," and claim 9 adds the variation of there being more than one portable biometric device within the range of the second device. Like the '923 patent, the '053 patent is directed to ineligible subject matter under 35 U.S.C. § 101.

**C.     The '307 patent is directed to generic devices configurable to perform the ineligible pairing process disclosed in the '923 and '053 patents.**

The '307 patent contains the same title—"System and Method for Wireless Device Pairing"—and the same specification as the '923 and '053 patents. The '307 patent, however, focuses on the devices on which the pairing process set forth in all three Asserted Patents can be performed.

Independent claim 1 claims "a portable monitoring device comprising,

a user interface comprising at least one of, a speaker; a vibramotor; motion sensors; gesture recognition sensors; a touch screen; a microphone; and buttons;

transmitter circuitry and receiver circuitry;

a plurality of sensors configurable to sense physical phenomena;

processing circuitry coupled to the plurality of sensors to receive sensor data and calculate metrics associated with a user, the processing circuitry configurable to communicate with another device and with a user wherein communicating comprises a pairing process between the portable device and the other device . . .

'307 patent at 15:1-20. Again, the pairing process itself is identical to that disclosed in the '923 and '053 patents and, as set forth above, is an abstract idea devoid of any inventive concept. The device disclosed in claim 1 is comprised of known components used in their conventional manner—an unspecified "user interface;" sensors configured to do what sensors typically do; and

processing circuitry configured to process in a standard manner. These same elements have been held insufficiently specific to save a patent directed to an otherwise abstract idea. *See* 973 ITC Action, Order No. 24 at 35-37 (device comprising "housing having a physical size and shape that is adapted to couple to the body of the user; a plurality of sensors…to generate sensor data which is representative of activity of the user, wherein the plurality of sensors includes at least three accelerometers [and] processing circuitry" did not confer eligibility on an otherwise abstract idea). Here, the patent does not even explain the connection between the elements of the device and the steps described for wireless pairing—there is nothing to indicate that these elements add an inventive concept to the pairing process. Dependent claim 2 adds variations on the metrics measured by the device, none of which are innovations on the standard metrics measured by the components disclosed in the device.

The "sensor system" disclosed in independent claim 5 adds no specificity to the subject matter and is, in fact, even more generic. It claims "a client device"—which contains no definition at all—configurable to communicate wirelessly with "a sensor device." The sensor device is composed of "a plurality of sensors configurable to collect user data, transmitter circuitry and receiver circuitry for communicating wirelessly"—with "communicating" taking the form of the pairing process disclosed in all three patents. '307 patent at 15:65-16:37.

Dependent claims 6-10 reveal just how broad the invention disclosed in claim 5 is by "specifying", respectively, that: (6) the sensor device "comprise" such generic components as a speaker, vibramotor, motion sensor, gesture recognition sensor, touch screen, microphone, or buttons; (7) the "cueing" comprises any of vibrating, displaying a message or playing an audio message; (8) tapping is detected by a motion sensor; (9) the sensor device "comprises" devices ranging from "a portable biometric monitoring device" to "a piece of exercise equipment" to a "mobile phone;" and (10) the client device comprises devices ranging from a personal computer to a mobile phone. In other words, claim 5 of the '307 patent, at its *narrowest*, purports to claim

pairing anything from two mobile devices together to an exercise machine and a computer, using the well-known pairing process disclosed in all three patents. Dependent claims 11-14 add to claim 5 additional limitations on the pairing process, none of which are inventive—use of a user account, transfer of data to a server, detection of the sensor device based on proximity, and detection of multiple sensor devices in proximity. *See* '307 patent at 16:38-17:29.

The "personal monitoring device" disclosed in independent claim 16 is just as broad, comprising: "a processor configured to execute a data collection process and a communication process; wireless transmitter circuitry and wireless receiver circuitry for communicating with a client device; a plurality of sensors for sensing user data comprising, sleep activity; step count; calorie burn; distance traversed; speed; and heart rate; [and] a user interface for communicating with the user, wherein communicating" constitutes the pairing process disclosed in all three patents. *Id.* at 17:30-18:16. None of dependent claims 17-19 add anything innovative to this device or the way in which it performs the pairing process.

In short, none of the devices disclosed in the '307 patent add any specific or unconventional "physical attributes" or "structural elements" to the abstract "pairing process" disclosed in the '923 and '053 patents. *See* 973 ITC Action, Order No. 24 at 36 ("Viewed as a whole, the claimed apparatus was known and conventional, including, the housing, the plurality of sensors, the three accelerometers, the processing circuitry and the display."). Accordingly, the '307 patent, too, is ineligible under 35 U.S.C. § 101.

## CONCLUSION

For the foregoing reasons, Jawbone submits that it is clear on the face of U.S. Patent Nos. 9,048,923, 9,026,053 and 9,106,307 that the subject matter to which these patents are directed is ineligible under 35 U.S.C. § 101. Accordingly, Jawbone respectfully requests that the Court grant judgment under Rule 12(c) and dismiss this case.

Respectfully submitted,

**SUSMAN GODFREY L.L.P.**

Dated: August 8, 2016

KALPANA SRINIVASAN
ksrinivasan@susmangodfrey.com
1901 Avenue of the Stars
Los Angeles, California 90067-6029
[Tel.] (310) 789-3100
[Fax] (310) 789-3150

MAX L. TRIBBLE, JR. (*Pro Hac Vice*)
mtribble@susmangodfrey.com
JOSEPH S. GRINSTEIN (*Pro Hac Vice*)
jgrinstein@susmangodfrey.com
1000 Louisiana, Suite 5100
Houston, Texas 77002-5096
[Tel.] (713) 651-9366
[Fax] (713) 654-6666

GENEVIEVE VOSE WALLACE (*Pro Hac Vice*)
gwallace@susmangodfrey.com
EDGAR G. SARGENT (*Pro Hac Vice*)
esargent@susmangodfrey.com
E. LINDSAY CALKINS (*Pro Hac Vice*)
lcalkins@susmangodfrey.com
1201 Third Avenue, Suite 3800
Seattle, Washington 98101-3000
[Tel.] (206) 516-3880
[Fax] (206) 516-3883

ELISHA BARRON (*Pro Hac Vice*)
ebarron@susmangodfrey.com
1301 Avenue of the Americas, 32nd Floor
New York, New York 10019
[Tel.] (212) 336-8330
[Fax] (212) 336-3800

IAN B. CROSBY (*Pro Hac Vice*)
icrosby@susmangodfrey.com
1201 Third Avenue, Suite 3800
Seattle, Washington 98101-3000
[Tel.] (206) 516-3880
[Fax] (206) 516-3883

By:  /s/ Kalpana Srinivasan

Kalpana Srinivasan
*Attorneys for Defendants AliphCom and BodyMedia, Inc.*