UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| FITBIT, INC.,<br>             Plaintiff,<br><br>   v.<br><br>ALIPHCOM, et al.,<br>             Defendants. | Case No.  15-cv-04073-EJD<br><br>**CLAIM CONSTRUCTION ORDER**<br>Re: Dkt. Nos. 87, 89, 94 |

United States District Court
Northern District of California

Plaintiff Fitbit, Inc. ("Fitbit") brings this suit against Defendants AliphCom d/b/a Jawbone and Bodymedia, Inc. (collectively "Jawbone") for infringement of U.S. Patent Nos. 9,026,053 (the "'053 patent"), 9,106,307 (the "'307 patent"), and 9,048,923 (the "'923 patent") (collectively, the "patents-in-suit").  Fitbit currently asserts claims 1, 2, and 5-9 of the '053 patent, claims 1-3 and 16-19 of the '307 patent, and claims 1, 2, 7-10, and 13 of the '923 patent.  Across these claims, the parties dispute the proper construction of seven terms.  Upon consideration of the claims, specification, prosecution history, and other relevant evidence, and after hearing the arguments of the parties, the court construes the contested language of the patents-in-suit as set forth below.

## I.   BACKGROUND

The parties are health and fitness companies that both sell wearable activity trackers.  In general, wearable activity trackers are small, lightweight devices that track a user's activities throughout the day, such as how many steps the user takes, how long the user sleeps, and how many calories the user has burned.  The devices can then be connected to a user's computer or smartphone, where they upload the data they collect.  The user can then view this data through an

1
Case No.: 15-cv-04073-EJD
CLAIM CONSTRUCTION ORDER

United States District Court
Northern District of California

1  application or website, and analyze it for trends, set or track progress on fitness goals, and share

2  their activities with friends through social networking.

3      In order for data to be seamlessly transmitted between the device and the smartphone, the

4  devices are often "paired" to the user's smartphone or computer before first use.   Pairing sets up a

5  unique system of contact between the device and the smartphone or computer such that the two

6  can automatically synchronize data whenever they are connected, without requiring intervention

7  from the user.  For example, a Bluetooth-enabled device that is paired to a Bluetooth-enabled

8  smartphone will automatically upload data whenever it comes within range of the smartphone.

9      Fitbit's asserted patents relate to a specific approach to pairing a wireless device, such as a

10 wearable activity tracker, to a "client" and/or "server."  All three patents are entitled "System and

11 Method for Wireless Device Pairing" and share the same specification.  The '053 patent was filed

12 first, on February 17, 2013, and the '923 and '307 patents were filed as divisional applications on

13 December 24, 2013 and March 27, 2014, respectively.  The '053 patent issued on May 5, 2015,

14 the '923 patent issued on June 2, 2015, and the '307 patent issued on August 11, 2015.

15     All of the asserted claims recite a method or system for pairing that involves three discrete

16 entities: a portable monitoring device, a "client," and a "server."  '053 patent, col. 14 l. 63-col. 16

17 l. 4; '923 patent, col. 15 ll. 2-49; '307 patent, col. 15 ll. 2-47, col. 17 l. 30-col. 18 l. 16.  Figure 1

18 illustrates the interaction between these three actors:

19
20
21
22
23
24
25
26
27
28



FIG. 1

United States District Court
Northern District of California

1   Figures 13 and 14 illustrate the pairing process:



FIG. 13

FIG. 14

22   This process begins when a user enters account login information (e.g., creates an account or logs

23   into an existing account) in the client.  '053 patent, col. 9 l. 65-col. 10 l. 54, figs. 13, 14.  Next, the

24   client sends a signal to the server to indicate that the pairing process has been triggered, and the

25   server sends back a user interface or user data for use in the pairing process.  *Id.*  The client then

26   wirelessly detects nearby monitoring device(s), requests response(s) from these device(s), and then

27   sends those response(s) to the server.  *Id.*  The server then sends back the list of responsive

28   device(s) that are eligible for pairing (because, for example, they are not already paired with

3

another user account, they are compatible with the user's account, etc.). *Id*. The client then sends the eligible device(s) a request to pair. *Id*. These device(s) then cue the user, who "taps" the particular device they wish to pair. *Id*. The "tapped" device identifies itself to the client, and the client and server complete the pairing process. *Id*.

The asserted independent claims generally follow this process. For example, claim 1 of the '053 patent recites:

> 1. A wireless communication method comprising:
>
> a first portable biometric device and a second device communicating wirelessly to initiate a pairing process between the first portable biometric device and the second device, wherein the first portable biometric device comprises, at least one sensor, and wireless communication circuitry in a unit suitable to be worn by a moving human device user, wherein initiating the pairing process comprises, the second device receiving user login information to log the user into a user account;
>
> the second device sending a signal to a server that indicates the start of the pairing process;
>
> the server sending a user interface for pairing to the second device;
>
> the second device wirelessly detecting the first biometric device, and requesting a response from the first biometric device;
>
> the second device receiving a response from the first biometric device, including a device identification;
>
> in response to the second device forwarding the received response to the server, the server sending a list of detected devices eligible for pairing to the second device; and
>
> when the first biometric device is on the list of detected devices, the second device sending a command to the first biometric device to enter pairing mode;
>
> the first portable biometric device generating a cue to the first portable biometric device user requesting the first portable biometric device user to validate the pairing between the first portable biometric device and the second device;
>
> the first portable biometric device receiving input from the user indicating the user's agreement to validate the pairing request, wherein input comprises tapping only the first portable biometric device one or more times anywhere on its exterior;
>
> the first portable biometric device detecting the tapping using a motion sensor;

4

the first portable biometric device responding to the user input by remotely signaling the second device to complete the pairing process;

the second device and the first portable biometric device remotely communicating to complete the pairing process, wherein the first portable biometric device and a second device are remote from each other throughout the pairing process, after which the first portable biometric device and the second device are able to recognize each other; and

the first portable biometric device and the second device automatically communicating to wirelessly exchange data subsequent to pairing when the first portable biometric device and the second device are within wireless communication range;

wherein data comprises sensor data collected and stored by the first portable biometric device

'053 patent, col. 14 l. 63-col. 16 l. 5.

## II.   LEGAL STANDARDS

### A.   Claim Construction

Claim construction is a question of law to be decided by the court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), aff'd 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). "[T]he interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)). Consequently, courts construe claims in the manner that "most naturally aligns with the patent's description of the invention." *Id*.

In construing disputed terms, the court looks first to the claims themselves, for "[i]t is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (internal quotation marks omitted). Generally, the words of a claim should be given their "ordinary and customary meaning," which is "the meaning that the term[s] would have to a person of ordinary skill in the art in question at the time of the invention." *Id*. at 1312-13. In some instances, the ordinary meaning to a person of skill in the art is clear, and claim construction may involve "little more than the application of the widely accepted meaning of commonly

understood words." *Id.* at 1314.

In many cases, however, the meaning of a term to a person skilled in the art will not be readily apparent, and the court must look to other sources to determine the term's meaning. *Id.* Under these circumstances, the court should consider the context in which the term is used in an asserted claim or in related claims, bearing in mind that "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313. Indeed, the specification is "'always highly relevant' " and "'[u]sually dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

The court may also consider the patent's prosecution history, which consists of the complete record of proceedings before the United States Patent and Trademark Office and includes the cited prior art references. The court may consider prosecution history where it is in evidence, for the prosecution history "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it otherwise would be." *Id.* at 1317 (internal citations omitted).

Finally, the court is also authorized to consider extrinsic evidence in construing claims, such as "expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980 (internal citations omitted). Although the court may consider evidence extrinsic to the patent and prosecution history, such evidence is considered "less significant than the intrinsic record" and "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.* at 1317-18 (internal quotation marks and citation omitted). Thus, while extrinsic evidence may be useful in claim construction, ultimately "it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1319.

### B.    Means-Plus-Function Claiming

The Patent Act authorizes functional claiming: "[a]n element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of

United States District Court
Northern District of California

6

structure, material, or acts in support thereof, and such claim shall be construed to cover the

corresponding structure, material, or acts described in the specification and equivalents thereof."

35 U.S.C. § 112(f). [1]  "In enacting this provision, Congress struck a balance in allowing patentees

to express a claim limitation by reciting a function to be performed rather than by reciting

structure for performing that function, while placing specific constraints on how such a limitation

is to be construed, namely, by restricting the scope of coverage to only the structure, materials, or

acts described in the specification as corresponding to the claimed function and equivalents

thereof."  *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347 (Fed. Cir. 2015) (en banc).

Thus, "if one employs means-plus-function language in a claim, one must set forth in the

specification an adequate disclosure showing what is meant by that language."  *Blackboard, Inc. v.

Desire2Learn, Inc.*, 574 F.3d 1371, 1382 (Fed. Cir. 2009) (internal quotation marks omitted).  "If

the specification does not contain an adequate disclosure of the structure that corresponds to the

claimed function, the patentee will have failed to particularly point out and distinctly claim the

invention as required by the second paragraph of §112, which renders the claim invalid for

indefiniteness."  *Id*. (internal quotation marks omitted).

   To determine whether a purportedly means-plus-function term is indefinite, courts employ

a two-step process.  First, courts determine whether the term-in-question is a means-plus-function

term.  "[T]he use of the word 'means' in a claim element creates a rebuttable presumption that §

112(f) applies."  *Id*. at 1348.  Conversely, "the failure to use the word 'means' . . . creates a

rebuttable presumption . . . that § 112(f) does not apply."  *Id*.  However, "when a claim term lacks

the word 'means,' the presumption can be overcome and § 112(f) will apply if the challenger

demonstrates that the claim term fails to 'recite[] sufficiently definite structure' or else recites

'function without reciting sufficient structure for performing that function.'"  *Williamson v. Citrix

Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015) (quoting *Watts v. XL Svs., Inc.*, 232 F.3d 877,

880 (Fed. Cir. 2000)).  "In undertaking this analysis, we ask if the claim language, read in light of

---

[1] The America Invents Act ("AIA"), Pub. L. No. 112–29, effective September 16, 2012, changed
the designation of 35 U.S.C. 112 ¶ 6 to 35 U.S.C. 112(f).  Because the asserted patents were filed
after the effective date of the AIA, the Court refers to the post-AIA versions of this provision.

United States District Court
Northern District of California

the specification, recites sufficiently definite structure to avoid § 112, ¶ 6." *Media Rights Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1372 (Fed. Cir. 2015), *cert. denied sub nom. Media Rights Techs., Inc. v. Capitol One Fin. Corp.*, 136 S. Ct. 1173, 194 L. Ed. 2d 178 (2016) (internal quotation marks and citation omitted).

Once a court determines that a claim term is a means-plus-function term, the court "next determine[s] whether the specification discloses sufficient structure that corresponds to the claimed function." *Williamson*, 792 F.3d at 1351. This, in turn, is a two-step process:

> The court must first identify the claimed function. Then, the court must determine what structure, if any, disclosed in the specification corresponds to the claimed function. Where there are multiple claimed functions, . . . the patentee must disclose adequate corresponding structure to perform all of the claimed functions. If the patentee fails to disclose adequate corresponding structure, the claim is indefinite.

*Id*. at 1351-52 (internal citation omitted).

When a defendant challenges a means-plus-function term as indefinite, indefiniteness must be proven by "clear and convincing evidence." *Microsoft Corp. v. i4i Ltd. Partnership*, 564 U.S. 91, 102 (2011). However, "[i]n determining whether [the] presumption [based on the lack of the word 'means'] has been rebutted, the challenger must [only] establish by a preponderance of the evidence that the claims are to be governed by § 112, ¶ 6." *Advanced Ground Info. Svs., Inc. v. Life360, Inc.*, 830 F.3d 1341, 1347 (Fed. Cir. 2016).

## III.   CONSTRUCTION OF DISPUTED TERMS

### A.   "a server" ('053 Patent claim 1; '923 Patent claim 1; '307 Patent claims 1 and 16)

| Fitbit's Proposed Construction | Jawbone's Proposed Construction | Court's Construction |
|---|---|---|
| "a component in communication, directly or indirectly, with one or more of the device and the client" | "a computer that provides services and resources to other devices in response to external requests over a network" | "a physical computing device in communication, directly or indirectly, with one or more of the device and the client" |

The term "a server" appears in each of the asserted independent claims. In all of these claims, the server fulfills two primary roles: (1) supplying the list of devices that are eligible for pairing; and (2) providing a "user interface" or "user data" "for pairing. Relevant portions of

United States District Court
Northern District of California

those claims recite:

> the [second/first/other/client] device sending a signal to a *server* that indicates the start of the pairing process;
>
> the *server* sending a user interface for pairing to the [second/first/other/client] device;
>
> . . .
>
> in response to the [second/first/other/client] device forwarding the received response to the server, the *server* sending a list of detected devices eligible for pairing to the second device;

'053 patent, col. 15 ll. 7-10, 16-19 (emphasis added); '923 patent, col. 15 ll. 23-26, 31-34 (emphasis added); '307 patent, col. 15 ll. 24-27, 33-36, col. 17 l. 47-col. 18 l. 2, col. 18 ll. 8-12 (emphasis added).

Fitbit argues that inventor lexicography governs this court's construction because the specification states that "[t]he term 'server' refers to a server in communication, directly or indirectly, with one or more of the device and the client." '053 patent, col. 4 ll. 1-3; Fitbit Opening Br. 5, Dkt. No. 87. Jawbone disagrees, and instead proposes a construction which requires the server (1) to be a "computer," and (2) to "provide[] services and resources to other devices in response to external requests over a network." Jawbone Responsive Br. 2, Dkt. No. 89. Fitbit contends that both limitations are improperly narrow. Fitbit Opening Br. 6-10, Dkt. No. 87. The court addresses these issues in turn.

### i.   Inventor Lexicography

A patentee "is free to act as his own lexicographer, and may set forth any special definitions of the claim terms in the patent specification or file history, either expressly or impliedly." *Schoenhaus v. Genesco, Inc.*, 440 F.3d 1354, 1358 (Fed. Cir. 2006) (citing *Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004)). "In such cases, the inventor's lexicography governs." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005).

The Court agrees with Fitbit that, here, the patentee acted as his own lexicographer. The specification specifically states that "server" "refers to" a particular meaning. This is similar to other instances of inventor lexicography that the Federal Circuit has enforced. *See, e.g.*, *Braintree*

1   *Labs., Inc. v. Novel Labs., Inc.*, 749 F.3d 1349, 1356 (Fed. Cir. 2014), cert. denied, 135 S. Ct. 764,

2   190 L. Ed. 2d 630 (2014) (statement that "[t]he terms 'clinically significant' as used herein are

3   meant to convey . . ." was inventor lexicography); *Microsoft Corp. v. Int'l Trade Comm'n*, 731

4   F.3d 1354, 1360 (Fed. Cir. 2013) (statement that "[t]he 'state' of the contents of a collection stored

5   at a server refers to . . ." was inventor lexicography).  Accordingly, the Court finds that the

6   inventor has clearly defined "server" as "a server in communication, directly or indirectly, with

7   one or more of the device and the client" and must adhere to this definition.

8        **ii.**    **Jawbone's Proposed Limitations**

9       However, the Court cannot stop here.  This definition fails to resolve two disputes

10   presented by the parties: (1) whether the server must be "a computer," and (2) whether a server is

11   required to "provide[] services and resources to other devices in response to external requests over

12   a network."  Where a dispute regarding claim scope exists, the Court must resolve it.  *O2 Micro*

13   *Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) ("When the

14   parties raise an actual dispute regarding the proper scope of these claims, the court, not the jury,

15   must resolve that dispute.").

16        **a.**  **Whether the server is a "computer"**

17       Turning to the parties' first dispute, Jawbone argues that the "server" must be a

18   "computer" because the specification consistently describes it as such and the prosecution history

19   estops a broader definition.  Jawbone Responsive Br. 2-5, Dkt. No. 89.  Fitbit, on the other hand,

20   contends that the "server" is merely a "component," as neither the specification nor the

21   prosecution history provides a basis for a narrower construction.  Fitbit Opening Br. 6-7, Dkt. No.

22   87.

23       While the Court agrees with Fitbit that "server" need not necessarily be a "computer," it

24   nevertheless finds that "server" should be limited to a physical, computing device, rather than a

25   piece of software.   Although "[w]ords of a claim are generally given their ordinary and customary

26   meaning," this is not a meaning in a vacuum.  *Phillips*, 415 F.3d at 1312 (internal quotation marks

27   and citation omitted).  Instead, this is "the meaning that the term would have to a person of

28   ordinary skill in the art in question at the time of the invention," who, importantly, is "deemed to

United States District Court
Northern District of California

read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id*. at 1312, 1313. Ultimately, the "construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Trustees of Columbia Univ. in City of N.Y. v. Symantec Corp.*, 811 F.3d 1359, 1366 (Fed. Cir. 2016) (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)).

These principles compel that the "server" cannot be mere software.  In this case, all of the asserted claims require the interaction of three distinct actors: (1) a portable monitoring device ("first portable biometric monitoring device" in claim 1 of the '053 patent, "portable monitoring device" in claim 1 of the '307 patent, "personal monitoring device" in claim 16 of the '307 patent, "second device" in claim 1 of the '923 patent), (2) a client device ("second device" in claim 1 of the '053 patent, the "other device" in claim 1 of the '307 patent, the "client device" in claim 16 of the '307 patent, and the "first device" in claim 1 of the '923 patent), and (3) a "server."  This means that, in the claimed inventions, the client and the server are separate entities and cannot be the same thing.  The specification generally discloses two types of embodiments: (1) "device-server embodiments," such as in Figures 2 and 3, where the client and sever are the same thing, and (2) "client-server embodiments," such as in Figure 1, where the client and server are distinct entities.  In all of the client-server embodiments, [2] the server is a physical, computing device.  For example, in Figure 1, "[s]erver 106 represents one or many network servers (e.g. internet [sic] servers) that store user data collected by device 101." '053 patent, col. 4 ll. 35-37.  In another embodiment, a "device is paired through a user's cell phone to a user account" and "the cell phone will communicate with the device, and also with any server in proximity to exchange data." *Id*., col. 2 ll. 46-49.  The background section of the patent also mentions that a device can be discovered by "client software (such as software on a personal computer (PC) in communication with a cloud-based server)." *Id*., col. 1 ll. 43-45.  Indeed, nowhere in the specification does it

United States District Court
Northern District of California

---

[2] The Court notes that Fitbit also relies on device-server embodiments to support its claim construction position. *See, e.g.*, Fitbit Opening Br. 6, Dkt. No. 87.  However, these are unclaimed embodiments and may not be commensurate with the scope of the particular "client" and "server" that are recited in the claims.  As such, the Court finds them less helpful in its analysis here.

United States District Court
Northern District of California

1　disclose that the "server" is a mere software application.  The Federal Circuit has recognized that

2　"[w]here a patent 'repeatedly and consistently' characterizes a claim term in a particular way, it is

3　proper to construe the claim term in accordance with that characterization."  *GPNE Corp. v. Apple*

4　*Inc.*, 830 F.3d 1365, 1370 (Fed. Cir. 2016) (citing *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308,

5　1318 (Fed. Cir. 2014); *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1374–75 (Fed. Cir.

6　2009)).   The patents here repeatedly characterize the "server" as a physical computing device, so

7　its construction should reflect as much.

8　　　　However, this computing device need not be as narrow as "computer;" instead, it could

9　include devices such as tablets and smartphones.  Nothing in the claims or specification indicates

10　that, in the claimed client-server invention, the "server" must be a traditional network server.

11　Indeed, at the time of invention, smartphones were powerful computing devices in their own right.

12　"It is axiomatic that [Courts] will not narrow a claim term beyond its plain and ordinary meaning

13　unless there is support for the limitation in the words of the claim, the specification, or the

14　prosecution history."  *3M Innovative Properties Co. v. Tredegar Corp.*, 725 F.3d 1315, 1333 (Fed.

15　Cir. 2013).  On the question of whether these intrinsic sources indicate that the "server" must be

16　limited to a certain class of computing devices, the Court finds none.  If anything, they indicate the

17　opposite.  Claim 5 of the '923 patent, a dependent claim to claim 1, recites that "the server device

18　comprises a mobile phone."  '923 patent, col. 16 ll. 10-11.  This means that, at least in claim 1 of

19　the '923 patent, "server" must be broad enough to include a "mobile phone."  Although this serves

20　as extrinsic evidence for the claims in the '053 and '307 patents, it still has persuasive value and

21　the intrinsic evidence provides no reason for the Court to deviate from this understanding for these

22　claims.  Accordingly, for these reasons, the Court concludes that "server" can be any physical,

23　computing device.

24　　　　The prosecution history does not warrant an alternate conclusion.  Although Jawbone has

25　correctly identified an instance of prosecution history estoppel, it does not provide guidance on

26　this dispute.  During prosecution, the examiner imposed a restriction requirement, and Fitbit

27　elected to pursue claims "drawn to an embodiment of using resident user account, Fig. 9" (none of

28　which mentioned a "server"), as opposed to claims "drawn to an embodiment of using web based

user account, Fig. 14" (which included dependent claims that mentioned a "server").   Fitbit

Opening Br., Dkt. No. 87, Ex. 3 at FB4073_00041532.  After a series of rejections, though, Fitbit

added back limitations which require interaction with a server, which overcame prior art rejections

and resulted in allowance.  *Id*. at FB4073_00041719-20, 34.  Prosecution history estoppel

"preclude[s] patentees from recapturing through claim interpretation specific meanings disclaimed

during prosecution."  *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003).

Accordingly, here, Fitbit's actions preclude it from claim interpretations that would make it such

that the claims did not require a "server" or the interactions with a server that are recited in the

claims.  However, the position it takes is not that—Fitbit does not dispute that the claims require a

"server," but merely contends that a "server" can be any hardware or software "component."

Accordingly, the prosecution history does not aid the Court's analysis here.

In sum, for the reason expressed above, the court finds that, instead of "computer" or

"component," "server" should be construed as "physical, computing device."

### b.  Whether the server must "provide[] services and resources to other devices in response to external requests over a network"

Turning to the parties second dispute, Jawbone argues that the "server" must "provide[]

services and resources to other devices in response to external requests over a network."  Jawbone

Responsive Br. 2-5, Dkt. No. 89.  Fitbit argues that none of these requirements are warranted.

Fitbit Br. 8-10, Dkt. No. 87.

The Court agrees with Fitbit.  As Fitbit correctly points out, the claims already provide

substantial detail about the functions the server must perform.  In a sense, some of these include

the provision of some "services and resources to other devices," such as "sending user interface

data," '923 patent, col. 15 ll. 15-16, or "sending a list of detected devices eligible for pairing to the

other device," *id*., col. 15 ll. 32-34.  The latter also appears to be a "response to [an] external

request[]," namely, the forwarded responses received by the client.  *Id*., col. 15 ll. 31-32.  Adding

the additional requirement that the server explicitly "provide[] services and resources to other

devices in response to external requests" is redundant and unnecessary, and only threatens to

provide a source of unclarity.  Accordingly, the Court declines to do so.

United States District Court
Northern District of California

The Court also finds the remainder of Jawbone's proposed construction, "over a network," unwarranted. Nowhere in the specification are the forms of communication used by the server limited or even defined. Instead, the specification simply states that the server is "in communication, directly or indirectly, with one or more of the device and the client." '053 patent, col. 4 ll. 1-3. Further, although not directly applicable to the server itself, the specification appears to generally embrace a broad view of "communication" when describing interactions between actors in the system. For example, when describing how the system determines which portable monitoring devices are eligible for pairing, the specification states that "[c]ommunicating in this context may mean one party (device, client, server, set of devices, set of clients, or set of servers) broadcasting packets and the other party listening for and receiving packets (unidirectional communication)." '053 patent, col. 6 ll. 6-9. No other specifics are given. Accordingly, nothing in the intrinsic record suggests that the server should be limited to communicating "over a network." Federal Circuit case law "do[es] not support prescribing a more particularized meaning unless a narrower construction is required by the specification or prosecution history." *3M Innovative Properties Co. v. Tredegar Corp.*, 725 F.3d 1315, 1329 (Fed. Cir. 2013). Seeing none here, the court declines to limit communication to "over a network."

The term "server" is accordingly construed as "a physical computing device in communication, directly or indirectly, with one or more of the device and the client."

### B.   "tapping" ('053 Patent claim 1; '923 Patent claim 1; '307 Patent claim 1)

| Fitbit's Proposed Construction | Jawbone's Proposed Construction | Court's Construction |
|---|---|---|
| "touching or light touching of the device once or multiple times on any part of its exterior" | "imparting a light physical impact or blow, as distinguished from touching" | "momentary touching or light touching detectable by a motion sensor" |

The term "tapping" appears in claim 1 of each of the '053 patent, '923 patent, and '307 patent. In each of these claims, "tapping" is used to validate the client's request to pair with the device. Relevant portions of those claims recite:

> the first portable biometric device receiving input from the user indicating the user's agreement to validate the pairing request,

wherein input comprises *tapping* only the first portable biometric device *one or more times* anywhere on its exterior;

the first portable biometric device detecting the *tapping* using a motion sensor;

'053 patent, col. 15 ll. 23-34 (emphasis added).

the second device receiving input from the user to respond to the request, wherein the input is received by one or more of the plurality of sensors, wherein input comprises *tapping* only the second device anywhere on its exterior;

the second device detecting the *tapping* using a motion sensor;

'923 patent, col. 15 ll. 40-46 (emphasis added).

the portable monitoring device receiving input from the user to validate the pairing request, wherein input comprises *tapping* the device on any part of its exterior; and

detecting the *tapping* with one of the motion sensors.

'307 patent, col. 15 ll. 43-47 (emphasis added).

The parties each advance a specific type of contact which they claim constitutes "tapping." Jawbone argues that "tapping" is not just mere "touching," but is a specific type of short-duration touching that requires "imparting a light physical impact or blow." Jawbone Responsive Br. 5-6, Dkt. No. 89. Jawbone claims that the specification supports its construction, and that Fitbit endorsed a similar definition during prosecution. *Id.* Fitbit disagrees and argues that the specification makes clear that "tapping" is merely "touching" or "light touching," but adds that it occurs "once or multiple times on any part of [the device's] exterior." Fitbit Opening Br. 10-11, Dkt. No. 87.

The Court agrees with Jawbone to the extent that "tapping" is not just any type of contact, but contact that is impactful and momentary. All clams require that "tapping" is something that must be detected with motion sensors. '053 patent, col. 15 ll. 33-34; '923 patent, col. 15 ll. 45-46; '307 patent, col. 15 ll. 43-47. The specification elaborates that these motion sensors are distinguishable from other types of sensors, such as a capacitive touch sensors or audio sensors. '053 patent, col. 5 ll. 55-56. It also gives several examples of detecting tapping with a motion sensor, such as sensing "by an accelerometer when the user quickly touches any part of the exterior of the device." '053 patent, col. 5 ll. 45-46. The use of a motion sensor implies that the

1   tap must cause some movement—even if small and imperceptible to the human eye—of the device

2   itself.  This is different from other types of touching, such as placing a finger on a capacitive touch

3   sensor (e.g., on an iPhone screen), which requires no movement of the device in order to be

4   detected.  Accordingly, "tapping" must at least be impactful in the sense that it causes motion

5   detectable by a motion sensor.

6         The patents also make clear that "tapping" must be momentary.  Several times throughout

7   the specification—as well as in the body of claim 1 of the '053 patent itself—the patents mention

8   that tapping can be performed "multiple times."  '053 patent, col.2 l. 35, col. 7 ll. 53, 56.  If

9   tapping is such that it can be repeated, this suggests that the duration of contact is finite and likely

10  short.  In addition, in the portion of the specification that describes user validation in detail, it

11  discloses that the user validates the device by "tapping or double tapping the device."  '053 patent,

12  col. 7 ll. 52.  It then goes on to state that alternative forms of user interaction are possible:

13              Other validation interactions include, but are not limited to multiple
              taps of the device, pressing a button, picking up the device,
14            performing a gesture holding or wearing the device, either touching
              or performing a gesture on a touch sensitive part of the device, and
15            entering some data about the device or displayed on the device into
              the client (e.g. entering a code displayed on the device into the
16            client).

17  *Id.*, col. 7 ll. 50-53.  This juxtaposition between tapping and other forms of touching that are less

18  momentary, such as picking up the device or touching a touch-sensitive part of the device, also

19  suggests that tapping refers to a specific type of touching that is brief in duration.  Accordingly,

20  "tapping" must also be contact that is momentary.

21        The prosecution history is not inconsistent with these observations.  During prosecution,

22  Fitbit argued that the '053 patent application was distinguishable over a prior art reference, U.S.

23  Patent Application No. 2007/0223476 to Fry, which disclosed user input through a "tapping

24  sequence, where a tap is a physical impact imparted on the device."  9/17/2014 Response at 7.  In

25  its remarks, Fitbit acknowledged that "Fry does disclose tapping of devices."  *Id.* at 6.  Although

26  the Court does not find, contrary to Jawbone's argument, that this is an explicit endorsement of

27  Fry's definition of "tap" ("a physical impact imparted on the device") such that Fitbit can be said

28  to have "clear[ly] and unmistakab[ly]" disavowed conceptions of "tap" that fall outside this

United States District Court
Northern District of California

16

definition, *see Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323-24 (Fed. Cir. 2003), this nevertheless shows that Fitbit was aware of this interpretation and considered it one type of contact that could be "tapping."  This is not inconsistent with "tapping" being momentary and having some physical effect on the device.

Thus, the Court finds that "tapping" is contact that is momentary and has some impact on the device's physical motion.  However, Jawbone's proposal that there be "a light physical impact or blow" is confusing and goes too far.  The salient point is that tapping must cause some movement of the device, such that the tap can be detected by a motion sensor.  It is not clear that contact must rise to the level of a "light physical impact" or a "blow" to do this.  For this reason, the Court will reject Jawbone's language and instead adopt a modified version of Fitbit's "touching or light touching" construction.  In doing so, the Court finds Fitbit's "touching or light touching" phrasing helpful, but the remainder of Fitbit's proposal ("of the device once or multiple times on any part of its exterior") is unwarranted.  How many times and where the device may be tapped are addressed in the claims themselves and need not be repeated in the Court's construction.  Claim terms should not be construed in a manner that results in such redundancies. *See Robotic Vision Sys., Inc. v. View Eng'g, Inc.*, 189 F.3d 1370, 1376 (Fed. Cir. 1999) (rejecting a construction on the ground that it "would necessarily be redundant and would add no additional limitations.").

Accordingly, the term "tapping" is construed as "momentary touching or light touching detectable by a motion sensor."

**C.    "[the second device / the first device / the other device / the at least one client device / the client device] sending a signal to a server that indicates the start of the pairing process" ('053 Patent claim 1; '923 Patent claim 1; '307 Patent claims 1 and 16)**

| Fitbit's Proposed Construction | Jawbone's Proposed Construction | Court's Construction |
|---|---|---|
| The phrase identified by Jawbone is not subject to § 112(f) and no construction is necessary. The phrase is amenable to its plain and ordinary meaning. | The phrase is governed by § 112(f), and there is no corresponding structure, acts, or materials, rendering the phrase indefinite. | The phrase identified by Jawbone is not subject to § 112(f) and no construction is necessary. The phrase is amenable to its plain and ordinary meaning. |

United States District Court
Northern District of California

| | | |
|---|---|---|
| ***Alternative proposed construction***: The corresponding structure, acts, or materials are sufficiently defined in the specification. | ***Alternative proposed construction***: "transmitting information to a server over a network connection that indicates that the pairing process has started" | |

The parties dispute whether this phrase is subject to 35 U.S.C. 112(f). As the Federal Circuit has instructed, if a claim uses the word "means," there is a rebuttable presumption that § 112(f) applies, and, if the claim does not use the word "means," there is a rebuttable presumption that § 112(f) does not apply. *Williamson*, 792 F.3d at 1348. However, even if a claim does not use the word "means," the presumption can be overcome if "the claim term fails to 'recite[] sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'" *Id.* (quoting *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000)). The claims at issue here do not use the word "means." However, Jawbone nevertheless argues that § 112(f) applies because "device" is a generic, nonce word that the claims describe in purely functional terms (i.e., "sending a signal to a server that indicates the start of the pairing process"), and thus fail to recite sufficiently definite structure. Jawbone Responsive Br. 7-9, Dkt. No. 89. Fitbit disagrees, pointing out that the claims themselves identify a specific structure that performs "sending a signal to a server that indicates the start of the pairing process"—in claim 1 of the '923 patent, for example, the "first device" as opposed to the "second device"—and the specification gives several examples of this structure, including a "cell phone," laptop computer," "desktop computer," and "health station." Fitbit Opening Br. 13, Dkt. No. 87.

The Court agrees with Fitbit. In determining whether a party has overcome the presumption that § 112(f) does not apply, the Federal Circuit directs the Court to "ask if the claim language, read in light of the specification, recites sufficiently definite structure to avoid § 112, ¶ 6." *Media Rights Techs.*, 800 F.3d at 1372. "The question is whether the claim language names particular structures or, instead, refers only to a general category of whatever may perform specified functions." *Robert Bosch, LLC v. Snap-On Inc.*, 769 F.3d 1094, 1099 (Fed. Cir. 2014).[3]

---

[3] *Robert Bosch*, 769 F.3d at 1094, was decided before *Williamson*. However, *Media Rights Techs.*, a case which followed *Williamson*, cited *Robert Bosch* approvingly in explaining how courts should conduct the § 112(f) inquiry post-*Williamson*. *Media Rights Techs.*, 800 F.3d at 1372.

United States District Court
Northern District of California

This case involves the former.  In all of the asserted claims in which this term appears, the entity which is performing the specified function, "sending a signal to a server," is discretely identified as the "[second/other/client/first] device."  This sets out a broad class of devices, but it is not boundless.  As explained in Section III.G, a person of ordinary skill in the art would understand this term to refer to a computing device, such as a smartphone, laptop, or desktop, running client software that is specifically programmed with client software, such as that disclosed in the algorithm in Figures 13 and 14.  *See* Section III.G, *infra*.

This "[second/other/client/first] device" recites sufficient structure for the function of "sending a signal to a server that indicates the start of the pairing process."  Neither the claims nor the specification provide much detail about this function; instead, it appears to be a simple transmission of a data signal from the client to the server.  The specification makes only one passing mention of it and simply states that "the client tells the server to begin a pairing process." '053 patent, col. 9 l. 67.  Given the relatively simple nature of this function, the "[second/other/client/first] device" is sufficiently definite structure, as this term requires a device that has the basic, general-purpose computing ability to transmit a data signal.  *Cf. In re Katz Interactive Call Processing Patent Litigation*, 639 F.3d 1303, 1316 (Fed. Cir. 2011) (a general purpose processor is sufficient structure for the function of "receiving," as this function "can be achieved by any general purpose computer without special programming").  For example, cell phones, laptop computers, and desktop computers all transmit data.  Accordingly, with respect to the function of "sending a signal to a server that indicates the start of the pairing process," the claims recite sufficient structure for performing this function.  The Court agrees with Fitbit that this term is not subject to § 112(f).

Jawbone requests in the alternative that this Court construe this term as "transmitting information to a server over a network connection that indicates that the pairing process has started."  Jawbone Responsive Br. 9, Dkt. 89.  The only difference between this proposed construction and the plain language of the claims is that Jawbone has added the requirement that information be sent "over a network connection."  This is the same limitation that Jawbone proposed with respect to "server."  For the same reasons the Court finds this limitation

unwarranted there, this Court also finds it unwarranted here.  *See* Section III.A, *supra.*

Accordingly, the Court rejects Jawbone's alternative proposal.

Accordingly, the Court concludes that "[the second device / the first device / the other device / the at least one client device / the client device] sending a signal to a server that indicates the start of the pairing process" is not subject to § 112(f) and should instead be given its plain and ordinary meaning.

### D.  "forwarding the received response to the server" ('053 Patent claim 1; '923 Patent claim 1; '307 Patent claims 1 and 16)

| Fitbit's Proposed Construction | Jawbone's Proposed Construction | Court's Construction |
|---|---|---|
| No construction necessary for the phrase identified by Jawbone. The phrase is amenable to its plain and ordinary meaning. | "transmitting the information received from the [first biometric device] in response to the request from [the second device] over a network connection to the server" | No construction necessary for the phrase identified by Jawbone. The phrase is amenable to its plain and ordinary meaning. |

This phrase appears in each of the asserted independent claims.  Relevant portions of these claims recite:

> the [second/first/other/client] device receiving a response from the [first biometric/second/portable monitoring/personal monitoring] device, including a device identification;

> in response to the [second/first/other/client] device *forwarding the received response to the server*, the server sending a list of detected devices eligible for pairing to the [second/first/other/client] device;

'053 patent, col. 15 ll. 14-19 (emphasis added); '923 patent, col. 15 ll. 28-34 (emphasis added); '307 patent, col. 15 ll. 29-36, col. 18 ll. 7-12 (emphasis added).

The parties' only dispute with respect to this term is the same as one of the disputes that the Court already addressed with respect to "server": whether the server's communication must be limited to communication "over a network."  For the same reasons that the Court found Jawbone's proposed "over a network" limitation unwarranted there, the Court also finds Jawbone's proposed "over a network connection to the server" limitation unwarranted here.  *See* Section III.A, *supra.*

Jawbone nevertheless argues that its proposed construction is "consistent with the specification" and identifies several instances where it contends that the specification discloses

communication over a network.  Jawbone Responsive Br. 10-11, Dkt. 89 (citing '053 patent, col. 1 25-28, col. 2 ll. 53-54, col. 10 ll. 9-15).  The Court agrees with Jawbone that the '053 patent discloses embodiments (including those described at col. 1 25-28 and col. 2 ll. 53-54) where the server communicates over the network.  However, "it is improper to read a limitation from the specification into the claims." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 904 (Fed. Cir. 2004).  Jawbone points to nothing in the intrinsic record that indicates that these are anything more than disclosed embodiments or that these disclosures are so "repeated" and "consistent" so as to warrant limiting communication with the server in this way.  *See VirnetX, Inc.*, 767 F.3d at 1318. The Court also discerns none.  Accordingly, the Court finds this argument unpersuasive.

Forwarding a response is not so technical a concept that a jury would be aided by the court's construction of this term.  Accordingly, the court finds that no construction is necessary for this term, it should be given its plain and ordinary meaning.

**E.   "the server sending a list of detected devices eligible for pairing to the [second/first/other/client] device" ('053 Patent claim 1; '923 Patent claim 1; '307 Patent claims 1 and 16)**

| Fitbit's Proposed Construction | Jawbone's Proposed Construction | Court's Construction |
| --- | --- | --- |
| No construction necessary for the phrase identified by Jawbone. The phrase is amenable to its plain and ordinary meaning. | "the server transmitting over a network connection identity information for more than one device that has responded to a request from the [second / first / other / client] device" | "the server sending a list of zero or more detected devices eligible for pairing to the [second/first/other/client] device" |

As with the previous term, this phrase appears in each of the asserted independent claims. Relevant portions of these claims recite:

the [second/first/other/client] device receiving a response from the [first biometric/second/portable monitoring/personal monitoring] device, including a device identification;

in response to the [second/first/other/client] device forwarding the received response to the server, *the server sending a list of detected devices eligible for pairing to the [second/first/other/client] device*;

'053 patent, col. 15 ll. 14-19 (emphasis added); '923 patent, col. 15 ll. 28-34 (emphasis added); '307 patent, col. 15 ll. 29-36, col. 18 ll. 7-12 (emphasis added).

United States District Court
Northern District of California

The parties' dispute two issues with respect to this term: (1) whether communication by the server must be "over a network; and (2) whether the "list of detected devices eligible for pairing" must be a list of more than one.  The Court has already resolved this first dispute in Sections III.A and III.D, *supra*.  For the same reasons discussed in those sections, the Court finds Jawbone's proposed "over a network connection" limitation unwarranted here.

Turning to the parties' second dispute, the parties disagree as to the size of "list."  Jawbone argues that the "list of detected devices eligible for pairing" must be a list of more than one, Jawbone Responsive Br. 12-13, Dkt. No. 89, whereas Fitbit maintains that this can be a list of one or none, Fitbit Opening Br. 15-17, Dkt. No. 87.  To support its position, Jawbone identifies a single passage from the specification, which discloses that, when the client is determining which devices are nearby, it sends "a list of devices" "[w]hen more than one device responds."  Jawbone Responsive Br. 12, Dkt. No. 89 (citing '053 patent, col. 10 ll. 1-9).  Jawbone reasons that, if the client only sends a list of devices to the server when there is more than one device, the server will only respond with a list of devices when there is more than one device (and, by necessity, this list will include more than one device, since if the list of "detected devices" from the client is more than one, the list of "detected devices eligible" from the server will be more than one).  *Id.*  Fitbit responds that is merely a description of an embodiment that does not rise to the level of disavowal, and that the claims and plain meaning of "list" support its contention that a list can be empty or contain only one item.  Fitbit Opening Br. 15-17, Dkt. No. 87; Fitbit Reply Br. 9-10, Dkt. No. 94.

The Court agrees with Fitbit.  Claims are to be read in light of the specification, not the other way around.  Here, the language of the claims plainly allows for the list of eligible devices to be singular or empty.  Immediately before the disputed limitation, the claims recite that the client "receive[s] a response" from a single personal monitoring device.  '053 patent, col. 15 ll. 14-19 (emphasis added); '923 patent, col. 15 ll. 28-34 (emphasis added); '307 patent, col. 15 ll. 29-36, col. 18 ll. 7-12 (emphasis added).  Then, in the disputed limitation, the clams recite "in response to the [second/first/other/client] device forwarding *the received response* to the server, the server sending a list of *detected* devices eligible for pairing to the [second/first/other/client] device."  *Id*.  This means that, even when only one device is detected, its response is forwarded to the server and

the server must send back the "list of detected devices eligible."  Sending this list is not a conditional requirement—the server must send it regardless of the number of devices initially detected.  Thus, in the case that only one device is detected, this list will at most be a list of one, and, in the case that the only detected device is not eligible, it will be a list of none.  Accordingly, the claims plainly allow for lists of one or zero.  Jawbone's proposed construction is too restrictive.

The isolated disclosure that Jawbone identifies in the specification does not alter this conclusion.  This describes a single embodiment, not the invention itself.  *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 904 (Fed. Cir. 2004) ("[I]t is improper to read a limitation from the specification into the claims.").  Further, it is not even clear that, in this particular embodiment, the "list of detected devices eligible" sent from the server will be a list of more than one.  Even though, in this embodiment, the client only sends a "list of detected devices" when the list is greater than one, it could be the case that one or zero devices from that list is eligible.  In that case, it is possible that when "[a]n identification of the eligible devices is sent to the client," '053 patent, col. 10 ll. 14-15, this is a list of one or none.  Accordingly, even in this embodiment, it is possible that the "list of devices eligible" is singular or empty.  Jawbone's logic fails in the very evidence it cites.

The ordinary meaning of "list" also supports the idea that the "list" at issue can contain one or no items.  Lists often can be empty or contain only one item.  For example, a grocery list that is started for the week may initially be empty and then, as a person notices certain items that needed to be bought, have one or more items added to it.  As another example, a list of "to-do" items may start out with multiple tasks and then, as tasks are accomplished, be reduced down to a list of one task, and then a list of no outstanding tasks.  These lists do not cease to become lists as soon as they contain one or no items—they are simply empty lists.  The same principles apply to the list of eligible devices here.

Accordingly, the phase "the server sending a list of detected devices eligible for pairing to the [second/first/other/client] device" is construed as "the server sending a list of zero or more detected devices eligible for pairing to the [second/first/other/client] device."

### F.    "the first biometric device" ('307 Patent claim 16)

| Fitbit's Proposed Construction | Jawbone's Proposed Construction | Court's Construction |
|---|---|---|
| This term should be replaced by "personal monitoring device." This was a clerical error during the prosecution of the '053, '923, and '307 Patents. | Indefinite for lack of antecedent basis. | This term should be replaced by "personal monitoring device." This was a clerical error during the prosecution of the '053, '923, and '307 Patents. |

The parties dispute whether the mention of "the first biometric device" in claim 16 of the '307 patent is a clerical error that should be replaced with "personal monitoring device."

"It is well-settled law that, in a patent infringement suit, a district court may correct an obvious error in a patent claim." *CBT Flint Partners, LLC v. Return Path, Inc.*, 654 F.3d 1353, 1358 (Fed. Cir. 2011). "A district court can correct a patent only if (1) the correction is not subject to reasonable debate based on consideration of the claim language and the specification and (2) the prosecution history does not suggest a different interpretation of the claims." *Id.* (quoting *Novo Industries L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003)). This inquiry should be conducted "from the point of view of one skilled in the art." *Ultimax Cement Manufacturing Corp. v. CTS Cement Manufacturing Corp.*, 587 F.3d 1339, 1353 (Fed. Cir. 2009).

Here, Fitbit's proposed correction is not subject to reasonable debate. The phrase "first biometric device" appears in a claim that otherwise consistently refers to a single "personal monitoring device." It seems reasonable to infer that the "first biometric device" here is that same "personal monitoring device." Moreover, the phrase "first biometric device" appears in the middle of a relatively precise description of a back-and-forth interaction between two actors, where the client detects the monitoring device, the client requests a response from the device, and the device sends the response:

> the at least one client device wirelessly detecting the first biometric device, and requesting a response from the first biometric device
>
> the at least one client device receiving a response from the first biometric device, including a device identification;

'307 patent, col. 18 ll. 3-8. It seems illogical for the client to request a response from a device it did not detect. It also would not make sense for the client to receive a response from a device

United States District Court
Northern District of California

1   other than the one it requested a response from.  Accordingly, there can be no reasonable debate

2   from the face of the claims that "first biometric device" was intended to be "personal monitoring

3   device."

4          This conclusion is bolstered by the other independent claims in the asserted patents.  All of

5   these patents recite—in identical language—this same detect-request-respond interaction between

6   the client and a single device.  In all of these claims, the same word that is used to refer to that

7   device (e.g., "first biometric device," "second device," "other device") is used consistently in

8   those claim limitations.  '053 patent, col. 15 ll. 9-15; '923 patent, col. 15 ll. 27-30, '307 patent,

9   col. 15 ll. 28-32.  The limitations at issue here recite this same interaction in similar language; it

10  seems reasonable to infer that the patentee intended to claim the same thing here.

11         The prosecution history does not suggest a different interpretation of the claims.  If

12  anything, it confirms it.  On January 26, 2014, the applicant amended each of the independent

13  claims of the '307 patent (claims 1, 5, and 16) to include the identical detect-request-respond

14  limitations quoted above (in addition to other limitations relating to server-based interactions).

15  Fitbit Opening Br., Dkt. No. 87, Ex. 5 at FB4073_00042256-62.  All of these claims require a

16  pairing process with a single personal monitoring device, except claim 1 refers to it as a "personal

17  monitoring device," claim 5 refers to it as a "first biometric device," and claim 16 refers to it as

18  "portable monitoring device."  '307 patent, col. 15 ll. 2-47, col. 15 l. 65-col. 16 l. 38, col. 17 l. 30-

19  col. 18 l. 17.  When the detect-request-respond limitations were added to these claims, the new

20  limitations in claims 1 and 5 uniformly referred to the same personal monitoring device that was

21  recited in the rest of the claim body.  Fitbit Opening Br., Dkt. No. 87, Ex. 5 at FB4073_00042256-

22  58.  The new limitations in claim 16 also did so, except for the errant "first biometric device" that

23  Jawbone complains of here.  *Id*. at FB4073_00042261-62.  Comparing these amendments, it

24  seems clear that this was a copy/paste error.  (Indeed, the fact that claim 5 recites "first biometric

25  device" suggests that the amendments to claim 5 were copied into claim 16, and the drafter

26  overlooked one of the mentions of "first biometric device" that needed to be changed to "portable

27  monitoring device.")  Nothing in the prosecution history suggest that applicants ever intended for

28  claim 16 to be any different from the other claims, which all involve pairing with a single, portable

monitoring device.  Accordingly, the prosecution history confirms that this is a clerical error which the Court may correct.

Accordingly, the phase "first biometric device" is replaced with "personal monitoring device."

### G.    "client device" ('307 Patent claim 16)

| Fitbit's Proposed Construction | Jawbone's Proposed Construction | Court's Construction |
| --- | --- | --- |
| "software or a device that primarily acts as an access portal to the server" | Indefinite. | "device running client software that primarily acts as an access portal to the server" |

The term "client device" appears in claim 16 of the '307 patent.  This claim recites:

16. A personal monitoring device, comprising:

a processor configured to execute a data collection process and a communication process;

wireless transmitter circuitry and wireless receiver circuitry for communicating with a client device;

a plurality of sensors for sensing user data comprising,
sleep activity;

step count;

calorie burn;

distance traversed;

speed; and

heart rate;

a user interface for communicating with the user, wherein communicating comprises indicating to the user that the personal monitoring device has been requested by the *client device* to pair with the client device as part of a pairing process comprising,
the *client device* receiving user login information to log the user into a user account;

the *client device* sending a signal to a server that indicates the start of the pairing process;

the server sending a user interface for pairing to the *client device*;

the *client device* wirelessly detecting the personal monitoring device, and requesting a response from the first biometric device;

United States District Court
Northern District of California

the *client device* receiving a response from the personal monitoring device, including a device identification;

in response to the *client device* forwarding the received response to the Server, the server sending a list of detected devices eligible for pairing to the *client device*; and

when the personal monitoring device is on the list of detected devices, the *client device* sending a command to the personal monitoring device to enter pairing mode.

'307 patent, col. 17 l. 30-col. 18 l. 16 (emphasis added).

Fitbit argues that inventor lexicography governs this court's construction because the specification states that "[i]n this document, the term 'client' refers to client software or a client device that primarily acts as an access portal to a server." '053 patent, col. 3 ll. 66-67; Fitbit Opening Br. 19, Dkt. No. 87. Jawbone disagrees and argues that this term renders claim 16 indefinite. Jawbone Responsive Br. 16-18, Dkt. No. 89.

### i.    Claim Construction

The Court agrees with Fitbit that the patentee explicitly defined "client" as "client software or a client device that primarily acts as an access portal to a server." The specification clearly states that, "in this document" the word "client" "refers" to this specific meaning. As with "server," this falls in line with other instances of inventor lexicography which the Federal Circuit has found. *See* Section III.A, *supra*. However, claim 16 cuts more narrowly than the specification's disclosure of "client." Here, the claim explicitly requires a "client device." The plain meaning of the words requires hardware—a "device" is a physical machine, not just executable code. Accordingly, the Court finds the "software or" portion of Fitbit's proposed construction inappropriate.

The Court also finds it necessary to add one further clarification: the "client device" must be one that is programmed to run client software. Throughout the specification, the patents identify a number of different devices that can serve as a "client device," including a smartphone, tablet, laptop, netbook, desktop computer, and health station. '053 patent, col 4, ll. 13-15, 30-35. However, it consistently discloses that, for all of these devices, they are programmed to run client software. Toward the beginning of the specification, the patent explicitly states that "[i]n this

document, computer 104 and similar system elements that execute the client software are simply referred to as the client (e.g., client 104)." '053 patent, col. 4 ll. 17-20.  It also explicitly mentions embodiments of client devices being programmed with client software.  *See, e.g.*, *id.*, col. 1 ll. 44-45; col. 4 ll. 34-35 ("[c]ell phone 102, in an embodiment, executes client software as a mobile application"); *id.*, col. 7 ll. 14-15 ("a computing device running a client (such as a laptop or smartphone)").  Even when this device/software pairing is not made explicit, descriptions of client devices make clear, from the disclosed actions they perform, that they are programmed with client software.  *See, e.g.*, *id.*, col. 9 l. 63-col. 10 l. 24.  Accordingly, because the specification "repeatedly" and "consistently" describes the client device as one that runs client software, *see VirnetX, Inc.*, 767 F.3d at 1318, the Court finds it necessary to limit its scope in this way.

Accordingly, the Court construes "client device" as "device running client software that primarily acts as an access portal to the server."

### ii.   Indefiniteness

Having construed "client device," the Court must consider whether this term renders claim 16 indefinite.  Section 112 requires that "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention." 35 U.S.C. § 112(b).  In *Nautilus, Inc. v. Biosig Instruments, Inc.*, the Supreme Court established the operative test: "a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." ─── U.S. ───, 134 S.Ct. 2120, 2128-29, 189 L.Ed.2d 37 (2014).  The Federal Circuit has cautioned that "the dispositive question in an indefiniteness inquiry is whether the 'claims,' not particular claim terms" fail this test.  *Cox Commc'ns, Inc. v. Sprint Commc'n Co. LP*, 838 F.3d 1224, 1231 (Fed. Cir. 2016).  For that reason, a claim term that "does not discernably alter the scope of the claims" may fail to serve as a source of indefiniteness.  *Id.*

Here, "client device," as construed by this Court, is undeniably broad.  It simply requires a programmed device that "acts as an access portal to the server."  However, breadth does not mean indefiniteness.  Indeed, the intrinsic record provides substantial guideposts that define the concrete

United States District Court
Northern District of California

universe of "client devices."  Throughout the specification, the patents consistently refer to the "client" as either (1) client software, or (2) a client device running client software.  As discussed above, the claim 16 plainly requires only this second category, as "device" implies a physical machine.  Also as discussed above, this is a specially programmed machine, which runs client software.  The claims themselves set forth a detailed procedure for device-client-server operations that sufficiently bound the algorithm(s) by which this client software can operate.  In addition, Figures 13 and 14, as well as at least col. 9 l. 63-col. 10 l. 54, give one detailed example of this algorithm in an embodiment.  Accordingly, reading the claims in light of the intrinsic record, a person of ordinary skill in the art would be able to discern the scope of the invention with reasonable certainty.  *Nautilus*, 134 S.Ct. at 2128-29.

Moreover, the effect that "client device" has on the indefiniteness inquiry is tempered by the fact that it does not play a substantial role in defining the scope of the invention.  The primary contours of claim 16 come from the specific series of steps that the system takes to perform the pairing process.  The "client device" is simply the intermediary between the device and the server.  Regardless of what the "client device" is, a person of ordinary skill in the art would be able to identify whether a given pairing system followed the process outlined in claim 16 and, thus, infringed.  In *Cox Commc'ns, Inc.*, the Federal Circuit found that the term "processing system" "play[ed] no discernable role in defining the scope of the claims" and hence failed to be a source of indefiniteness.  838 F.3d at 1232.  Here too "client device" plays but a small role in shaping the scope of claim 16; thus, it has little effect on the definiteness of the claims.  For this additional reason, the Court disagrees that "client device" renders claim 16 indefinite.

Accordingly, "client device" is construed as "software or a device that primarily acts as an access portal to the server" and does not render claim 16 indefinite.

## IV.   ORDER

For the reasons set forth above, the Court Construes the disputed terms as follows:

| Claim Terms | Court's Construction |
|---|---|
| a server | a physical computing device in communication, directly or indirectly, with one or more of the |

United States District Court
Northern District of California

|  | device and the client |
| tapping | momentary touching or light touching detectable by a motion sensor |
| [the second device / the first device / the other device / the at least one client device / the client device] sending a signal to a server that indicates the start of the pairing process | The phrase identified by Jawbone is not subject to § 112(f) and no construction is necessary. The phrase is amenable to its plain and ordinary meaning. |
| forwarding the received response to the server | No construction necessary for the phrase identified by Jawbone. The phrase is amenable to its plain and ordinary meaning. |
| the server sending a list of detected devices eligible for pairing to the [second/first/other/client] device | the server sending a list of zero or more detected devices eligible for pairing to the [second/first/other/client] device |
| the first biometric device | This term should be replaced by "personal monitoring device." This was a clerical error during the prosecution of the '053, '923, and '307 Patents. |
| client device | device running client software that primarily acts as an access portal to the server |

**IT IS SO ORDERED.**

Dated: January 27, 2017



EDWARD J. DAVILA
United States District Judge