UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| FITBIT, INC.,<br><br>        Plaintiff,<br><br>    v.<br><br>ALIPHCOM, et al.,<br><br>        Defendants. | Case No. 15-cv-04073-EJD<br><br>**ORDER DENYING DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>Re: Dkt. No. 88 |

Presently before the Court is Defendants AliphCom d/b/a Jawbone and Bodymedia, Inc.'s (collectively "Defendants" or "Jawbone") motion for judgment on the pleadings that U.S. Patent Nos. 9,026,053 (the "'053 patent"), 9,106,307 (the "'307 patent"), and 9,048,923 (the "'923 patent") (collectively, the "patents-in-suit") are invalid for failure to claim patent-eligible subject matter under 35 U.S.C. § 101. Dkt. No. 88. For the reasons discussed below, the Court DENIES Jawbone's motion.

**I.     BACKGROUND**

The parties are health and fitness companies that both sell wearable activity trackers. In general, wearable activity trackers are small, lightweight devices that track a user's activities throughout the day, such as how many steps the user takes, how long the user sleeps, and how many calories the user has burned. The devices can then be connected to a user's computer or smartphone, where they upload the data they collect. The user can then view this data through an application or website, and analyze it for trends, set or track progress on fitness goals, and share their activities with friends through social networking.

1     In order for data to be seamlessly transmitted between the device and the smartphone, the
2 devices are often "paired" to the user's smartphone or computer before first use. Pairing sets up a
3 unique system of contact between the device and the smartphone or computer such that the two
4 can automatically synchronize data whenever they are connected, without requiring intervention
5 from the user. For example, a Bluetooth-enabled device that is paired to a Bluetooth-enabled
6 smartphone will automatically upload data whenever it comes within range of the smartphone.

7     Fitbit's asserted patents relate to a specific approach to pairing a wireless device, such as a
8 wearable activity tracker, to a "client" and/or "server." All three patents are entitled "System and
9 Method for Wireless Device Pairing" and share the same specification. The '053 patent was filed
10 first, on February 17, 2013, and the '923 and '307 patents were filed as divisional applications on
11 December 24, 2013 and March 27, 2014, respectively. The '053 patent issued on May 5, 2015,
12 the '923 patent issued on June 2, 2015, and the '307 patent issued on August 11, 2015.

13     All of the asserted claims recite a method or system for pairing that involves three discrete
14 entities: a portable monitoring device, a "client," and a "server." '053 patent, col. 14 l. 63-col. 16
15 l. 4; '923 patent, col. 15 ll. 2-49; '307 patent, col. 15 ll. 2-47, col. 17 l. 30-col. 18 l. 16. Figure 1
16 illustrates the interaction between these three actors:



Figures 13 and 14 illustrate the pairing process:



This process begins when a user enters account login information (e.g., creates an account or logs into an existing account) in the client. '053 patent, col. 9 l. 65-col. 10 l. 54, figs. 13, 14. Next, the client sends a signal to the server to indicate that the pairing process has been triggered, and the server sends back a user interface or user data for use in the pairing process. *Id*. The client then wirelessly detects nearby monitoring device(s), requests response(s) from these device(s), and then sends those response(s) to the server. *Id*. The server then sends back the list of responsive device(s) that are eligible for pairing (because, for example, they are not already paired with

another user account, they are compatible with the user's account, etc.). *Id*. The client then sends the eligible device(s) a request to pair. *Id*. These device(s) then cue the user, who "taps" the particular device they wish to pair. *Id*. The "tapped" device identifies itself to the client, and the client and server complete the pairing process. *Id*.

The asserted independent claims generally follow this process. For example, claim 1 of the '053 patent recites:

> 1. A wireless communication method comprising:
>
> a first portable biometric device and a second device communicating wirelessly to initiate a pairing process between the first portable biometric device and the second device, wherein the first portable biometric device comprises, at least one sensor, and wireless communication circuitry in a unit suitable to be worn by a moving human device user, wherein initiating the pairing process comprises, the second device receiving user login information to log the user into a user account;
>
> the second device sending a signal to a server that indicates the start of the pairing process;
>
> the server sending a user interface for pairing to the second device;
>
> the second device wirelessly detecting the first biometric device, and requesting a response from the first biometric device;
>
> the second device receiving a response from the first biometric device, including a device identification;
>
> in response to the second device forwarding the received response to the server, the server sending a list of detected devices eligible for pairing to the second device; and
>
> when the first biometric device is on the list of detected devices, the second device sending a command to the first biometric device to enter pairing mode;
>
> the first portable biometric device generating a cue to the first portable biometric device user requesting the first portable biometric device user to validate the pairing between the first portable biometric device and the second device;
>
> the first portable biometric device receiving input from the user indicating the user's agreement to validate the pairing request, wherein input comprises tapping only the first portable biometric device one or more times anywhere on its exterior;
>
> the first portable biometric device detecting the tapping using a motion sensor;

4

>the first portable biometric device responding to the user input by remotely signaling the second device to complete the pairing process;
>
>the second device and the first portable biometric device remotely communicating to complete the pairing process, wherein the first portable biometric device and a second device are remote from each other throughout the pairing process, after which the first portable biometric device and the second device are able to recognize each other; and
>
>the first portable biometric device and the second device automatically communicating to wirelessly exchange data subsequent to pairing when the first portable biometric device and the second device are within wireless communication range;
>
>wherein data comprises sensor data collected and stored by the first portable biometric device

'053 patent, col. 14 l. 63-col. 16 l. 5.

## II. LEGAL STANDARDS

### A. Motion for Judgment on the Pleadings

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." A Rule 12(c) motion challenges the legal sufficiency of the opposing party's pleadings. Judgment on the pleadings is appropriate when, even if all material facts in the pleading under attack are true, the moving party is entitled to judgment as a matter of law. *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009).

On a motion for judgment on the pleadings, "all material allegations in the complaint are accepted as true and construed in the light most favorable to the non-moving party." *Turner v. Cook*, 362 F.3d 1219, 1225 (9th Cir. 2004). "[A]ll reasonable inferences" must be made "in favor of the nonmoving party." *Mediran v. International Ass'n of Machinists and Aerospace Workers*, No. C09–0538 TEH, 2011 WL 2746601, at *2 (N.D. Cal. July 14, 2011). "When considering a motion for judgment on the pleadings, this court may consider facts that 'are contained in materials of which the court may take judicial notice.'" *Heliotrope General, Inc. v. Ford Motor Co.*, 189 F.3d 971, 981, n .18 (9th Cir. 1999) (citation omitted). A motion for judgment on the pleadings may be granted if, after assessing the complaint and matters for which judicial notice is proper, it appears "beyond doubt that the [non-moving party] cannot prove any facts that would

support his claim for relief." *Morgan v. County of Yolo*, 436 F.Supp.2d 1152, 1155 (E.D. Cal. 2006). In other words, the standard for a Rule 12(c) motion is essentially the same as that for a Rule 12(b)(6) motion. *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012).

### B. Patent Eligibility Under § 101

#### i. The *Mayo/Alice* Framework

35 U.S.C. § 101 provides that "[w]hoever invents or discovers any new and useful process, machine, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." However, the Supreme Court has recognized that these broad categories contain an implicit exception: "[l]aws of nature, natural phenomena, and abstract ideas are not patentable." *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107, 2116, 186 L. Ed. 2d 124 (2013) (internal quotation marks and citation omitted).

To determine whether a claim falls outside this exception, the Supreme Court has established a two-step framework: First, the court must "determine whether the claims at issue are directed to a patent-ineligible concept." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, —— U.S. ——, 134 S. Ct. 2347, 2355, 189 L. Ed. 2d 296 (2014). Second, if the claims are directed to patent-ineligible subject matter, the Court must "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id.* (quoting *Mayo Collaborative Servs. v. Prometheus Laboratories, Inc.*, 132 S. Ct. 1289, 1298, 1297, 182 L. Ed. 2d 321 (2012)). The Supreme Court has described this as a "search for an 'inventive concept'—i.e., an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Id.*

#### ii. Step One

In evaluating step one, "the 'directed to' inquiry applies a stage-one filter to claims, considered in light of the specification, based on whether 'their character as a whole is directed to excluded subject matter.'" *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016) (quoting *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1346 (Fed. Cir. 2015)).

1    The Federal Circuit has also described this inquiry as an evaluation of the "focus" or "basic thrust"
2    of the claims.  *See Enfish*, 822 F.3d at 1335-36; *BASCOM Glob. Internet Servs., Inc. v. AT&T*
3    *Mobility LLC*, 827 F.3d 1341, 1348 (Fed. Cir. 2016).  The Federal Circuit has recognized that this
4    process sometimes involves "close calls about how to characterize what the claims are directed
5    to."  *BASCOM*, 827 F.3d at 1349.  Courts must tow the fine line between assessing a claim's
6    "character as a whole" and "describing the claims at such a high level of abstraction and
7    untethered from the language of the claims [such that it] all but ensures that the exceptions to §
8    101 swallow the rule."  *Enfish*, 822 F.3d at 1335, 1337.
9          To date, the Federal Circuit has provided two examples of software claims that are not
10   directed to an abstract idea.  First, in *Enfish*, the Federal Circuit determined that claims directed to
11   a specific type of self-referential table for a computer database were not abstract because they
12   focused "on the specific asserted improvement in computer capabilities (i.e., the self-referential
13   table for a computer database)" instead of "a process that qualifies as an 'abstract idea' for which
14   computers are invoked merely as a tool," they were not directed to an abstract idea.  *Id*. at 1335-
15   36, 1339.  Second, in *McRO, Inc. v. Bandai Namco Games Am. Inc*., the Federal Circuit found that
16   patents that automated part of a preexisting method for 3-D facial expression animation were not
17   abstract because they "focused on a specific asserted improvement in computer animation, i.e., the
18   automatic use of rules of a particular type."  837 F.3d 1299, 1314 (Fed. Cir. 2016).
19         However, not all claims relating to computer technologies are not abstract.  Where the
20   focus of the claims is on "certain independently abstract ideas that use computers as tools" instead
21   of "an improvement in computers as tools," claims may fail step one.  *See, e.g.*, *Affinity Labs of*
22   *Texas, LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1262 (Fed. Cir. 2016) (claims relating to
23   "deliver[ing] content to a handheld wireless electronic device" were directed to an abstract idea
24   because they claimed "the general concept of out-of-region delivery of broadcast content through
25   the use of conventional devices, without offering any technological means of effecting that
26   concept"); *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1140, 1149 (Fed. Cir. 2016)
27   (claims related to logic circuit design in computer hardware were "drawn to the abstract idea of:
28   translating a functional description of a logic circuit into a hardware component description of the

7

logic circuit" because "they are so broad as to read on an individual performing the claimed steps mentally or with pencil and paper"); *Tranxition, Inc. v. Lenovo (United States) Inc.*, No. 2015-1907, 2016 WL 6775967, at *3 (Fed. Cir. Nov. 16, 2016) (claims relating to migration of computer settings were directed to an abstract idea because "manual migration is an abstract idea" and the claims merely "automate[d] the migration of data between two computers"). Restricting older, abstract ideas to certain technological environments also does not make them not abstract. *See, e.g.*, *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1094 (Fed. Cir. 2016) (observing that ineligible claims "merely implement an old practice in a new environment"). Thus, non-abstract claims that "improve the functioning of the computer itself," *Alice*, 134 S. Ct. at 2359, or are otherwise "directed to an improvement of an existing technology," *Enfish*, 822 F.3d at 1337, such as those in *Enfish* and *McRO*, remain a narrow class.

### iii. Step Two

In assessing step two, courts must "consider the elements of each claim both individually and 'as an ordered combination'" and assess whether there are any "additional features" in the claims that constitute an "inventive concept." *Alice*, 134 S. Ct. at 2357. This inventive concept "must be significantly more than the abstract idea itself," *BASCOM*, 827 F.3d at 1349, "must be more than well-understood, routine, conventional activity," *DIRECTV*, 838 F.3d at 1262, "and cannot simply be an instruction to implement or apply the abstract idea on a computer." *BASCOM*, 827 F.3d at 1349. For example, it may be found in an "inventive set of components or methods," "inventive programming," or an inventive approach in "how the desired result is achieved." *Elec. Power Grp.*, 830 F.3d at 1355.

The Federal Circuit has found an inventive concept in several cases. First, in *DDR Holdings, LLC v. Hotels.com, L.P.*, the Federal Circuit found that claims that addressed the "Internet-centric problem" of third-party merchant advertisements that would "lure . . . visitor traffic away" from a host website (because clicking on the advertisement would redirect the visitor to the merchant's website) amounted to an inventive concept. 773 F.3d 1245, 1248, 1259 (Fed. Cir. 2014). This was so, the Federal Circuit reasoned, because the claims "specify how interactions with the Internet are manipulated to yield a desired result" such that the interactions

are "not merely the routine or conventional use of the Internet." *Id*. at 1259. Second, in *BASCOM*, the Federal Circuit found that the claims directed to Internet content filtering recited the inventive concept of "install[ing] a filtering tool at a specific location, remote from the end-users, with customizable filtering features specific to each end user." 827 F.3d at 1350. The court reasoned that "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *Id*. The court found this to be the case there because the patents claimed a specific type of content filtering that took advantage of an ISP server's ability to associate internet requests with user accounts. *Id*. Third, in *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, the Federal Circuit found that claims relating to solutions for managing accounting and billing data over large, disparate networks recited an inventive concept because they contained "specific enhancing limitation[s] that necessarily incorporates the invention's distributed architecture—an architecture providing a technological solution to a technological problem." 841 F.3d 1288, 1301 (Fed. Cir. 2016). Use of this "distributed architecture" transformed the claims into patentable subject matter. *Id*.

Nevertheless, not all technological aspects of how a patented invention is implemented supply a basis for finding an "inventive concept." A claim that simply takes an abstract idea and adds "the requirement to perform it on the Internet, or to perform it on a set of generic computer components . . . would not contain an inventive concept." *BASCOM*, 827 F.3d at 1350. For example, in *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, the Federal Circuit found that claims directed to the abstract ideas of extracting data and recognizing patterns did not recite an inventive concept because they simply recited "generic scanner and computer to perform well-understood, routine, and conventional activities commonly used in industry." 776 F.3d 1343, 1348 (Fed. Cir. 2014), *cert. denied*, 136 S. Ct. 119, 193 L. Ed. 2d 208 (2015). Similarly, in *DIRECTV*, the court found there was no inventive concept because "[t]he claim simply recites the use of generic features of cellular telephones, such as a storage medium and a graphical user interface, as well as routine functions, such as transmitting and receiving signals, to implement the underlying idea." 838 F.3d at 1262. Limiting the field of use to a particular technological environment also does not supply an inventive concept. *Alice*, 134 S. Ct. at 2358

9

(noting that, under step two, "limiting the use of an abstract idea 'to a particular technological environment'" "is not enough for patent eligibility"). For example, in *buySAFE, Inc. v. Google, Inc.*, the Federal Circuit found that patent-ineligible claims relating to transaction guarantees could not be saved from ineligibility because they were restricted to online transactions, as "[a]t best, that narrowing is an 'attempt[] to limit the use' of the abstract guarantee idea 'to a particular technological environment,' which has long been held insufficient to save a claim in this context." 765 F.3d 1350, 1355 (Fed. Cir. 2014). Accordingly, the search for an inventive concept remains one that court must approach cautiously, "scrutiniz[ing] the claim elements more microscopically" than in step one. *Elec. Power Grp.*, 830 F.3d at 1354.

### iv. Preemption

In addition to these principles, several other considerations may be helpful in conducting a § 101 analysis: First, the Supreme Court has recognized that the "concern that undergirds [the] § 101 jurisprudence" is preemption. *Alice*, 134 S. Ct. at 2358. If a claim is so abstract so as to "pre-empt use of [the claimed] approach in all fields, and would effectively grant a monopoly over an abstract idea" is not patent-eligible. *Bilski v. Kappos*, 561 U.S. 593, 612, 130 S. Ct. 3218, 3231, 177 L. Ed. 2d 792 (2010). However, the inverse is not true: "[w]hile preemption may signal patent ineligible subject matter, the absence of complete preemption does not demonstrate patent eligibility." *Fairwarning IP*, 839 F.3d at 1098 (internal quotation marks and citation omitted).

Second (and relatedly), "claims that are 'so result-focused, so functional, as to effectively cover any solution to an identified problem' are frequently held ineligible under section 101." *DIRECTV*, 838 F.3d at 1265. For example, in *Elec. Power Grp.*, the Federal Circuit found that claims directed to "any way of effectively monitoring multiple sources on a power grid" instead of "some specific way of enabling a computer to monitor data from multiple sources across an electric power grid" did not contain an inventive concept. 830 F.3d at 1356. The Federal Circuit has noted that this framework "is one helpful way of double-checking the application of the Supreme Court's framework to particular claims—specifically, when determining whether the claims meet the requirement of an inventive concept in application." *Id.*

### III. DISCUSSION

Fitbit currently asserts claims 1, 2, and 5-9 of the '053 patent, claims 1-3 and 16-19 of the '307 patent, and claims 1, 2, 7-10, and 13 of the '923 patent (collectively, the "asserted claims"). With minor differences, the asserted claims of all three patents are similar in substance.[1] As a result, none of the asserted claims warrant a materially different analysis or result, so the Court will consider them collectively.

#### A. Step One

At step one of the *Mayo*/*Alice* framework, the Court must "determine whether the claims at issue are directed to a patent-ineligible concept," such as an abstract idea. *Alice*, 134 S. Ct. at 2355. Jawbone argues that such is the case here because the asserted claims are directed to the abstract ideas of "identifying and validating an electronic device" through "minimal user interaction." Mot. 15, Dkt. No. 88 (quoting '923 patent, col. 2 ll. 20-21). As such, they "focus" on "a fundamental building block of today's internet-based society—wirelessly connecting two computerized devices to enable the exchange of data." *Id.* at 16. Jawbone contends that nothing in the claims makes them less abstract than this, as they merely recite the routine interactions of computing devices connecting to each other, accomplished through the "ubiquitous" medium of wireless communication. *Id.* at 17. Jawbone also points out that many of the claim elements fall within information processing and notification features that the Federal Circuit has already declared abstract. *Id.* at 18-19. Jawbone further argues that the claimed technology is effectively the Bluetooth protocol, and accordingly invokes the same preemption concerns that underlie the prohibition against patenting other abstract ideas. *Id.* at 17.

Fitbit disagrees, arguing that the claims are directed to a narrow improvement in device pairing that is specific to portable monitoring devices. Opp. 14, Dkt. No. 105. In particular, Fitbit argues that the claims' use of (1) a server to identify eligible devices and (2) tapping to indicate user validation specifically improves portable monitoring device technology, as this overcomes

---

[1] The parties do not appear to disagree, as Jawbone argues that the '053 and '307 patents are ineligible for the same or similar reasons which it set forth for the '923 patent. *See* Mot. 22-25, Dkt. No. 88. Moreover, Fitbit, the patentee, addressed the asserted claims collectively in its briefing and has not asserted that any of the asserted claims requires a separate eligibility analysis. *See* Opp. 14-18, Dkt. No. 105.

11

the problem that portable monitoring devices are small and often do not have keyboards or buttons that could be used in a pairing process. *Id*. at 15-16. Fitbit also suggests that the fact that the claims are directed to device pairing should alone be sufficient to take them out of the realm of the abstract, as pairing is a "technological process." *Id*. at 14.

In reply, Jawbone argues that neither the server nor tapping saves the claims under step one, as the server is a generic computer component, tapping as validation was known in the art, and Fitbit has proposed broad constructions for both that would allow these limitations to encompass almost anything. Reply 2-5, Dkt. No. 108.

The Court begins its analysis by considering what the "character as a whole" of the claims is "directed to." *Internet Patents*, 790 F.3d at 1346. Although the "directed to" inquiry is a "stage-one filter," the Federal Circuit has cautioned against "describing the claims at such a high level of abstraction and untethered from the language of the claims" such that it "all but ensures that the exceptions to § 101 swallow the rule." *Enfish*, 822 F.3d at 1337. After all, any generalized view of a claim would, "if carried to its extreme, make all inventions unpatentable because all inventions can be reduced to underlying principles of nature which, once known, make their implementation obvious." *Diamond v. Diehr*, 450 U.S. 175, 189 n.12, 101 S. Ct. 1048, 67 L. Ed. 2d 155 (1981). As such, the Federal Circuit "sometimes incorporates claim limitations into its articulation of the idea to which a claim is directed." *BASCOM*, 827 F.3d at 1349.

Applying these principles here, Jawbone's characterization of the claims sweeps too broad. The claims do not recite any process for connecting two devices, but a specific one, which at least requires: (1) a "client"[2] receiving user login information to log a user into an account; (2) the "client" sending a signal to a "server" to indicate the start of a pairing process; (3) the "server" sending back a user interface or data; (4) the "client" detecting portable monitoring device(s) and

---

[2] For simplicity, the Court will refer to the "second device" in claims 1, 2, and 5-9 of the '053 patent, the "first device" in claims 1, 2, 7-10, and 13 of the '923 patent, the "other device" in claims 1-3 of the '307 patent, and the "client device" in claims 16-19 of the '307 patent as the "client." The Court will refer to the "first [portable] biometric device" in claims 1, 2, and 5-9 of the '053 patent, the "second device" in claims 1, 2, 7-10, and 13 of the '923 patent, the "portable monitoring device" in claims 1-3 of the '307 patent, the "personal monitoring device" in claims 16-19 of the '307 patent, and the "first biometric device" in claims 16-19 of the '307 patent as the "portable monitoring device."

12

1  requesting response(s) from the portable devices; (5) the "client" forwarding the response(s) to a
2  server; (6) the "server" sending back a list of devices eligible for pairing; (8) the "client" sending a
3  request to pair to the portable monitoring device; (9) the portable device cuing the user for
4  validation; (10) the user validating the request by "tapping" the device; and (11) completing the
5  pair. *See* '053 patent, col. 14 l. 63-col. 16, l. 9, col. 16 ll. 19-39; '923 patent, col. 15 l. 2-col. 16 l.
6  3, col. 16 ll. 19-37, 47-50; '307 patent, col. 15 ll. 2-58, col. 17 l. 30-col. 18 l. 31. The Court's
7  claim construction creates further physical boundaries for some of these terms, as it has
8  determined that the "server" must be "a physical computing device in communication, directly or
9  indirectly, with one or more of the device and the client" and "tapping" must be "momentary
10 touching or light touching detectable by a motion sensor." Claim Construction Order at 8-17, Dkt.
11 No. 119. Also, for claim 16 of the '307 patent, the Court has concluded that the "client device"
12 should be a "device running client software that primarily acts as an access portal to the server."
13 *Id*. at 26-28. Thus, the "character as a whole" of the claims is not directed to device pairing
14 generally, but a specific flavor of portable device pairing, which is aware of user account
15 information, relies on a "server" to regulate the list of eligible devices, and uses "tapping" as the
16 means of user validation. Put succinctly, this focus distills to: server-authenticated pairing of a
17 portable monitoring device using tapping as validation.
18     The question then becomes whether this particular "flavor" of device pairing is an abstract
19 idea. The parties do not seem to dispute that device pairing, in its most basic form, constitutes an
20 abstract idea. Nor could they. Establishing a dedicated line of communication between two points
21 is a "broad and familiar concept concerning information distribution that is untethered to any
22 specific or concrete way of implementing it," *DIRECTV*, 838 F.3d at 1258, which has been
23 employed in everything from secure military communications to garage door openers. As such, it
24 remains a "building block[] of human ingenuity" and properly precluded from patent protection.
25 *Alice*, 134 S. Ct. at 2354.
26     Whether this is true of the "flavor" of pairing in the asserted claims, however, is a closer
27 question. In *Enfish*, the Federal Circuit held that claims "'purport[ing] to improve the functioning
28 of the computer itself,' or 'improv[ing] an existing technological process' might not succumb to

13

the abstract idea exception." *Enfish*, 822 F.3d at 1335. The asserted claims could be so characterized: the insertion of a server—a physical machine, under the Court's construction—and tapping—a subset of movements detectable by a motion detector, under the Court's construction—confine the asserted claims to less than device pairing generally, and they appear to provide an improvement to device pairing solutions that lack these steps. Nevertheless, the Federal Circuit has maintained, that, even with technical solutions provided in technical environments, solutions that can be performed "mentally or with a pencil and paper" fall within the realm of abstract ideas.[3] *Synopsys*, 839 F.3d at 1146-47, 1149. In addition, claims that "describe a desired function or outcome, without providing any limiting detail that confines the claim to a particular solution to an identified problem" are often directed towards abstract ideas. *Affinity Labs of Texas, LLC v. Amazon.com Inc.*, 838 F.3d 1266, 1269 (Fed. Cir. 2016); *see also Elec. Power Grp.*, 830 F.3d at 1356 ("[T]he essentially result-focused, functional character of claim language has been a frequent feature of claims held ineligible under § 101."). The asserted claims also have this character: the steps of the asserted claims are all relatively simple actions that could be performed manually, and their description is largely functional.

Given these competing considerations, the claims present a "close call[] about how to characterize what the claims are directed to," where the claims are not "unambiguously directed to an improvement in computer capabilities." *BASCOM*, 827 F.3d at 1349 (quoting *Enfish*, 822 F.3d at 1339). The Federal Circuit has instructed that, in such cases, "an analysis of whether there are arguably concrete improvements in the recited computer technology could take place under step two." *Id*. For example, in *BASCOM*, the Federal Circuit deferred ruling on whether claims relating to particular implementations of content filtering were abstract ideas under step one and proceeded to analyze them under step two. The Court finds itself in a similar situation here. Accordingly, the Court will decline to decide whether the claims' particular variant of portable

---

[3] For this reason, the Court finds Fitbit's argument that the asserted claims are not directed to an abstract idea simply because "pairing devices is a technical process" unavailing. Opp. 14, Dkt. No. 105. Even claims arising only in technical fields, such as logic circuit design in *Synopsys* or content delivery to a mobile device in *Affinity*, can be directed to an abstract idea if they broadly recite an abstract concept and say "apply it" in that field. *See Synopsys*, 839 F.3d at 1149; *Affinity*, 838 F.3d at 1269-70.

14

device pairing is an abstract idea, and assess whether, even if it is, the concrete improvements they recite are inventive concepts under step two.

### B.     Step Two

At step two, the Court must "consider the elements of each claim both individually and 'as an ordered combination'" and assess whether there are any "additional features" in the claims that constitute an "inventive concept." *Alice*, 134 S. Ct. at 2357.  Jawbone argues that there are none because the asserted claims are comprised of elements (e.g., transferring information over Bluetooth, connecting to the internet, "mobile devices," "server," "client") that are generic and well-known in the art.  Mot. 20-21, Dkt. No. 88.  Jawbone maintains that the claims are not confined to applications in wearable activity tracker technology, but that, even if they were, this does not save them under step two because limiting claims to a certain technical environment does not make them patentable.  *Id*. at 21.  Jawbone also argues that there is nothing inventive about the claims as an ordered combination, as there is nothing "non-conventional" or "non-generic" about how the claim elements are arranged and nothing they recite constitutes a specific improvement to portable device technology.  *Id*. at 21-22.

Fitbit disagrees, asserting that the use of a server to identify eligible devices and the use of tapping, detected by a motion sensor, to validate a pairing are unconventional elements which supply an inventive concept.  Opp. 16-17, Dkt. No. 105.  Fitbit also argues that the ordered combination of claim elements also supplies an inventive concept because it recites a specific, detailed, non-conventional sequence of steps, which far from preempt the entire field.  *Id*. at 17.  Fitbit further contends that an inventive concept can be found in the fact that the claims "improve[] [the] existing technological process" of portable device pairing by addressing issues relating to security (i.e., setting forth a reliable pairing mechanism, which ensures that a user's biometric data is not paired to the wrong device) without compromising design constraints.  *Id*. at 17-18.

In reply, Jawbone argues that neither the server nor tapping supply an inventive concept, as the "server" in the claims is just a generic, undefined component and tapping was a known form of validation at the time of invention.  Reply 7-10, Dkt. No. 108.

15

Weighing the parties' arguments against the asserted claims and appropriate context, the Court agrees with Jawbone that none of the claim elements, assessed individually, provide an inventive concept. Even under the Court's constructions, the "server," "client," and "portable monitoring device" are, in broad terms, generic, conventional components, none of which are inventive. The various steps of transmitting or receiving information and how they are accomplished are also generic—the claims recite these steps only functionally and require no inventive algorithm or data structure for performing them. *See DIRECTV*, 838 F.3d at 1262 (finding no inventive concept where "[t]he claim simply recites the use of generic features of cellular telephones, such as a storage medium and a graphical user interface, as well as routine functions, such as transmitting and receiving signals, to implement the underlying idea.").

The Court also agrees with Jawbone that the claims' relation to wearable activity tracker technology, in and of itself, does not make them patent-eligible. As the Supreme Court and Federal Circuit have long held, "limiting the use of an abstract idea 'to a particular technological environment'" "is not enough for patent eligibility." *Alice*, 134 S. Ct. at 2358.

Nevertheless, the Court agrees with Fitbit that the ordered combination of claim elements, interpreted in the light most favorable to Fitbit, contains inventive concepts. First, the addition of tapping as the form of validation is an inventive concept. As the background section of the patents highlights, one problem that confronted the process of pairing small, portable devices was that they were "purposefully designed to eliminate keyboards and multiple buttons in order to satisfy other design criteria." '053 patent, col. 1 ll. 49-51. Tapping overcame this problem in an inventive way because it took advantage of the inherent, technical capabilities of the portable monitoring device—its ability to detect motion with a motion sensor—to provide a manner of validating the device that was different from traditional forms of input (i.e., buttons and keyboards). This is similar to the inventive concept in *BASCOM*, which found that taking advantage of a technical feature of certain ISP servers—the ability "to identify individual accounts that communicate with the ISP server, and to associate a request for Internet content with a specific individual account"—transformed the idea of content filtering into a specific type of filtering that constituted a "technical improvement over prior art ways of filtering such content."

827 F.3d at 1350.

Jawbone nevertheless contends that tapping cannot supply an inventive concept because it was known in the art. This argument conflates patent eligibility with novelty, which are inquiries that, although "might sometimes overlap," *Mayo*, 132 S. Ct. at 1304, are separate. *See Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042, 1052 (Fed. Cir. 2016) (rejecting the argument that adding a second freeze-thaw cycle was not an inventive concept because it was allegedly obvious, reasoning that "patent-eligibility does not turn on ease of execution or obviousness of application. Those are questions that are examined under separate provisions of the Patent Act.") (citing *Mayo*, 132 S. Ct. at 1304).[4] Thus, even if tapping was a known form of validation, this does not necessarily prevent it from having a transformative effect on an abstract idea and bringing it within the realm of patentable subject matter. It is the case that "recit[ing] [an] abstract idea . . . along with the requirement . . . to perform it on a set of generic computer components . . . would not contain an inventive concept" because that, at base, would still just be the abstract idea. *BASCOM*, 827 F.3d at 1350. Adding in tapping to a portable device pairing process—even if tapping was a known form of validation—is not this, because it transforms a more abstract device pairing process into something specific: a pairing process narrowly tailored to a certain class of devices, which enables them to be paired even though they lack buttons or keyboards. In this sense, it "improves an existing technological process" by expanding the scope of devices that can be paired. *Alice*, 134 S. Ct. at 2358. For these reasons, tapping transforms the asserted claims into "something more" than just an abstract device pairing process. Accordingly, the fact that tapping appears in the prior art does not prevent it from supplying an inventive

---

[4] The Federal Circuit has also rejected the converse:

> It is true that "the § 101 patent-eligibility inquiry and, say, the § 102 novelty inquiry might sometimes overlap." *Mayo*, 132 S. Ct. at 1304. But, a claim for a *new* abstract idea is still an abstract idea. The search for a § 101 inventive concept is thus distinct from demonstrating § 102 novelty.

*Synopsys*, 839 F.3d at 1151; *see also Affinity*, 838 F.3d at 1263 ("the eligibility finding does not turn on the novelty of using a user-downloadable application for the particular purpose set out in the claims").

17

concept here.

Second, the use of a server as a part of the claimed pairing process supplies an inventive concept. As the name suggests, the concept of pairing traditionally involves two devices: the device that gets paired and the device it is paired with. *See also* '053 patent, col. 1 ll. 35-38. By injecting a third device—a server—into this process, the asserted claims shift this paradigm so that all of the information needed for pairing does not have to be provided through the two devices. Instead, the server can also regulate and facilitate this process. For example, the server can narrow the field of possible portable devices to pair by sending the client the list of devices that are "eligible"—e.g., devices that have not already been paired, that belong to a class of devices that that user's account is authorized to work with, etc. *Id.*, col. 6 l. 40-col. 7 l. 4. This helps accomplish the goal of "minimiz[ing] the amount of user interaction and input required in the pairing process," because the server can automatically supply eligibility information that a user might otherwise have to supply himself. Accordingly, when viewed in the light most favorable to Fitbit, the server limitation also helps transform a more abstract device pairing process into "something more" because it narrows it to a specific, discrete implementation of this idea that specifically addresses needs in the particular field of portable device monitors.

In sum, both the use of tapping and the use of a server, when considered along with the rest of the claims as an ordered combination, supply an inventive concept that transforms the asserted claims into patent eligible subject matter under step two.

## IV.   CONCLUSION

For the foregoing reasons, the Court concludes that the asserted claims are not patent-ineligible under 35 U.S.C. § 101 because they contain an inventive concept sufficient to transform these claims into patentable subject matter. Accordingly, the Court DENIES Jawbone's motion for judgment on the pleadings.

**IT IS SO ORDERED.**

Dated: February 9, 2017



EDWARD J. DAVILA
United States District Judge

18